

Villanova University School of Law
Villanova University School of Law Digital Repository

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-4-2008

# Odd v. Malone

Precedential or Non-Precedential: Precedential

Docket No. 06-4287

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Odd v. Malone" (2008). *2008 Decisions*. Paper 607.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/607

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-4287
No. 07-1490

———

KORVEL ODD,

v.

THOMAS MALONE;
OFFICE OF DISTRICT ATTORNEY OF PHILADELPHIA,

Appellants

———

NICOLE SCHNEYDER,

Appellant

v.

GINA SMITH, Esquire;
OFFICE OF DISTRICT ATTORNEY OF PHILADELPHIA,

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Nos. 06-cv-02242/06-cv-04986)
District Judges: Honorable Norma L. Shapiro and Honorable
Jan E. Dubois

Argued January 8, 2008
Before: FISHER, HARDIMAN and ALDISERT, *Circuit
Judges*.

(Filed: August 4, 2008)

Daniel Silverman (Argued)
Silverman & Associates
1429 Walnut Street, Suite 1001
Philadelphia, PA 19102
    *Attorney for Appellee Odd*
    *Attorney for Appellant Schneyder*

Ronald Eisenberg (Argued)
Three South Penn Square
Philadelphia, PA 19107
    *Attorney for Appellants Thomas Malone*
    *and Office of District Attorney of Philadelphia*
    *Attorney for Appellees Gina Smith*
    *and Office of District Attorney of Philadelphia*

OPINION OF THE COURT

HARDIMAN, *Circuit Judge*.

These consolidated appeals concern the scope of prosecutorial immunity. In both cases, prosecuting attorneys obtained bench warrants to detain material witnesses whose testimony was vital to murder prosecutions. Although the attorneys diligently obtained the warrants, they neglected to keep the courts informed of the progress of the criminal proceedings and the custodial status of the witnesses. The question before us is whether the attorneys are entitled to absolute prosecutorial immunity for their omissions.

In No. 07-1490, we decide whether a prosecutor may be sued under 42 U.S.C. § 1983 for failing to notify the relevant authorities that the proceedings in which the detained individual was to testify had been continued for nearly four months. In No. 06-4287, we decide whether a prosecutor may be sued for failing to notify the relevant authorities that the material witness remained incarcerated after the case in which he was to testify had been dismissed.

I.

Because we review the District Courts' rulings on Federal Rule of Civil Procedure 12(b)(6) motions to dismiss, our

recitation of the facts is limited to those alleged in Plaintiffs' complaints. *Yarris v. County of Delaware*, 465 F.3d 129, 134 (3d Cir. 2006). We accept those facts as true and draw all reasonable inferences in Plaintiffs' favor. *Id.*

A.      *Plaintiff-Appellant Nicole Schneyder (No. 07-1490*)

Nicole Schneyder was a reluctant but essential witness in three attempts by the Commonwealth of Pennsylvania to convict Michael Overby of first-degree murder. *See Commonwealth v. Overby*, 809 A.2d 295, 298-99 (Pa. 2002). In the first two trials, the court declared Schneyder unavailable and admitted her sworn statement into evidence. *Id.* at 299. The second jury convicted Overby and sentenced him to death, but the Pennsylvania Supreme Court ordered a new trial, holding that the handling of Schneyder's testimony violated Overby's Sixth Amendment right to confront the witnesses against him. *Id.* at 299-300.

In preparing to prosecute Overby a third time, Philadelphia Assistant District Attorney (ADA) Gina Smith obtained a material witness bench warrant for Schneyder's arrest from Judge Rayford Means of the Philadelphia County Court of Common Pleas. After a January 27, 2005 bail hearing, Schneyder, who was represented by a public defender, was detained after she failed to post the $300,000 bail set by the court. At that time, Judge Means directed ADA Smith in open court, and again in his robing room, to notify him of any delays in the *Overby* case, which was assigned to another judge. Schneyder alleges that Judge Means made clear that he intended

4

to release Schneyder in the event of a continuance, and that Smith acknowledged this admonition on the record.

On February 2, 2005, the *Overby* trial was continued until May 25, 2005. In spite of the court's directive, Smith failed to notify Judge Means of the continuance, and Schneyder remained incarcerated.

Schneyder and various family members repeatedly telephoned ADA Smith requesting Schneyder's release, but Smith took no action. When Schneyder's father died on February 28, 2005, her sister hired attorney Paul Conway, who obtained a court order permitting Schneyder to attend her father's March 4, 2005 funeral. After obtaining the order, which permitted Schneyder to attend only a few minutes of the funeral in handcuffs, Conway learned that Judge Means had instructed ADA Smith to notify him if the *Overby* case was continued. Conway notified Judge Means of the continuance, and Schneyder was promptly released on March 21, 2005, 54 days after she was first detained and 48 days after the *Overby* case was continued.

B.      *Plaintiff-Appellee Korvel Odd (No. 06-4287)*

Korvel Odd's experience was remarkably similar to that of Nicole Schneyder. Odd was reluctant to testify in the murder prosecution of Alvin Way, Jr. *See Commonwealth v. Way*, MC No. 0403-5118. Odd had witnessed events immediately preceding the murder, but when subpoenaed to testify at a preliminary hearing, he failed to appear. Consequently, Philadelphia ADA Thomas Malone sought a bench warrant for

5

Odd's arrest. The presiding judge in *Way* — Judge Marsha Neifield of the Philadelphia Court of Common Pleas — issued a "judge-only warrant"[1] pursuant to which Odd was arrested on November 17, 2004. Odd never had a bail hearing before Judge Neifield, but at ADA Malone's insistence, a trial commissioner ordered Odd to remain in custody for Way's preliminary hearing on December 7, 2004.

On December 7, 2004, Odd was transported to the courthouse, but ADA Malone never called him to testify. Judge Neifield then dismissed the case against Way for lack of evidence. Because Malone never informed Judge Neifield that Odd had been arrested, she did not know that he remained detained and took no action to release him. Consequently, Odd was returned to prison.

Odd eventually requested assistance from the Defender Association of Philadelphia, and attorney Glenn Gilman brought Odd's plight to Judge Neifield's attention. "Furious," Judge Neifield released Odd after 58 days of incarceration on January 13, 2005, and she "demanded that [Malone] appear before her to explain why . . . plaintiff had been forced to remain in jail."

In addition to their case-specific allegations, Schneyder and Odd further allege that, according to local custom and practice, the sole responsibility for tracking and monitoring the

---

[1] A "judge-only warrant" requires that the issuing judge be informed if and when the individual named in the warrant is arrested.

6

status of detained material witnesses falls to the Philadelphia District Attorney's Office (DA's Office) and the individual ADAs.

## C.    *The District Court Proceedings*

Schneyder and Odd sued the DA's Office and the ADAs under 42 U.S.C. § 1983, alleging that they were detained without probable cause in violation of the Fourth and Fourteenth Amendments.  In Schneyder's case, the District Court for the Eastern District of Pennsylvania (DuBois, J.) dismissed the § 1983 claim against ADA Smith and the pendent state law claims against Smith and the DA's Office.  The District Court held that Smith was entitled to absolute prosecutorial immunity, and that the Pennsylvania Tort Claims Act, 42 Pa.C.S. § 8541, barred the state law claims against the DA's Office.  Schneyder then withdrew her federal claim against the DA's Office and filed the present appeal to challenge the District Court's immunity holding.[2]

In Odd's case, the District Court for the Eastern District of Pennsylvania (Shapiro, J.) declined to dismiss the § 1983

---

[2]  To the extent that Schneyder appeals the dismissal of her state law claims, we affirm the District Court's dismissal of those claims.  Schneyder mentions the state law claims only in a footnote in her opening brief, and consequently, we consider any appeal regarding those claims to be waived. *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997).

claims against ADA Malone and the DA's Office. The District Court concluded that after *Way* was dismissed, "Malone was no longer acting as an advocate of the state." Malone filed an interlocutory appeal to challenge the District Court's holding that he was not entitled to absolute prosecutorial immunity. *See In re Montgomery County*, 215 F.3d 367, 373-74 (3d Cir. 2000).

II.

In light of Schneyder's voluntary dismissal of her remaining federal claim against the DA's Office, we have jurisdiction to review the District Court's final order dismissing all of Schneyder's claims and granting Smith prosecutorial immunity. 28 U.S.C. § 1291. We have jurisdiction over Malone's interlocutory appeal of the District Court's denial of prosecutorial immunity pursuant to the collateral order doctrine. *Montgomery County*, 215 F.3d at 373-74; *Kulwicki v. Dawson*, 969 F.2d 1454, 1459 (3d Cir. 1992) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)).

We review *de novo* the District Court's Rule 12(b)(6) dismissal of Schneyder's complaint based on absolute immunity. *Yarris*, 465 F.3d at 134; *Kulwicki*, 969 F.2d at 1461. Likewise, our review of the District Court's denial of Malone's motion to dismiss based on prosecutorial immunity is plenary. *Giuffre v. Bissell*, 31 F.3d 1241, 1251 (3d Cir. 1994). In both cases, we apply the same standard as the District Court, accepting as true the factual allegations in the complaint and drawing all reasonable inferences in favor of Schneyder and Odd. *Yarris*, 465 F.3d at 134; *Giuffre*, 31 F.3d at 1251. We will affirm the dismissal of Schneyder's case only if it appears from her

8

complaint that she can prove no set of facts that would entitle her to relief. *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996). We will affirm the District Court's refusal to dismiss Odd's case so long as his complaint states a claim upon which relief can be granted. *See* FED. R. CIV. P. 12(b)(6).

In seeking to dismiss the suits against them, ADAs Smith and Malone invoke prosecutorial immunity. More than a mere defense to liability, prosecutorial immunity embodies the "right not to stand trial," *Montgomery County*, 215 F.3d at 373 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985)), and is properly raised in a Rule 12(b)(6) motion to dismiss. *See, e.g.*, *Kulwicki*, 969 F.2d at 1461-62.

A prosecutor bears the "heavy burden" of establishing entitlement to absolute immunity. *Light v. Haws*, 472 F.3d 74, 80-81 (3d Cir. 2007) (quoting *Forsyth v. Kleindienst*, 599 F.2d 1203, 1212 (3d Cir. 1979)). In light of the Supreme Court's "quite sparing" recognition of absolute immunity to § 1983 liability, we begin with the presumption that qualified rather than absolute immunity is appropriate. *Carter v. City of Philadelphia*, 181 F.3d 339, 355 (3d Cir. 1999) (citing *Burns v Reed*, 500 U.S. 478, 486-87 (1991)).

To overcome this presumption, a prosecutor must show that he or she was functioning as the state's advocate when performing the action(s) in question. *Yarris*, 465 F.3d at 136. This inquiry focuses on "the nature of the function performed, not the identity of the actor who performed it." *Light*, 472 F.3d at 78 (quoting *Hughes v. Long*, 242 F.3d 121, 125 (3d Cir. 2001)). Under this functional approach, a prosecutor enjoys

absolute immunity for actions performed in a judicial or "quasi-judicial" capacity. *Giuffre*, 31 F.3d at 1251 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)); *Rose v. Bartle*, 871 F.2d 331, 346 (3d Cir. 1989). Thus, immunity attaches to actions "intimately associated with the judicial phases of litigation," but not to administrative or investigatory actions unrelated to initiating and conducting judicial proceedings. *Giuffre*, 31 F.3d at 1251 (quoting *Imbler*, 424 U.S. at 430) (internal quotation omitted); *see also Rose*, 871 F.2d at 346 (contrasting the prosecutor's "quasi-judicial" role from his "administrative/investigative" role).

Thus, the present appeal requires a "meticulous analysis" of the ADAs' actions, *Light*, 472 F.3d at 79, to determine whether they were "quasi-judicial" and entitled to absolute immunity, or "administrative or investigatory" and not so entitled. *Giuffre*, 31 F.3d at 1251-52; *Rose*, 871 F.2d at 346. The fact-intensive nature of this inquiry requires that we begin by reviewing the circumstances that the Supreme Court has interpreted in explaining the contours of prosecutorial immunity.

*A.      Supreme Court Jurisprudence*

The Supreme Court first acknowledged the absolute immunity of prosecutors to § 1983 suits in *Imbler v. Pachtman*, 424 U.S. 409, 420 (1976). Finding a common law tradition of prosecutorial immunity and strong policy considerations that supported extending immunity to the § 1983 context, *id*. at 421, 424, the Court defined the scope of prosecutorial immunity with reference to the facts of the case. *Id*. at 430.

10

Deputy District Attorney Richard Pachtman successfully prosecuted Paul Imbler for felony murder. *Id*. at 412. After Imbler's conviction and sentence, Pachtman discovered new evidence that corroborated Imbler's alibi and cast doubt on the credibility of a key prosecution witness. *Id*. Pachtman informed the governor of his discovery, *id*. at 412, and Imbler obtained a writ of habeas corpus based primarily on the new evidence. *Id*. at 414. After his exoneration and release, Imbler sued, alleging that Pachtman used false testimony and suppressed material evidence at Imbler's murder trial. *Id*. at 415-16.

Accepting these allegations as true, the Supreme Court affirmed the dismissal of Imbler's complaint, holding that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." *Id*. at 431. The Court left open the question whether absolute immunity would attach to "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." *Id*. at 430-31.

The Court answered this question in *Burns v. Reed*, 500 U.S. 478, 495-96 (1991). There, police officers suspected Cathy Burns of shooting her two sons. *Id*. at 481. Believing that Burns had multiple personalities, the police asked prosecutor Reed if they could interrogate Burns under hypnosis. *Id*. at 482. Reed approved. *Id*. Under hypnosis, Burns referred to her sons' attacker as "Katie," and also referred to herself by that name. *Id*. Once the officers obtained Reed's assurance that they had probable cause, they arrested Burns. *Id*. Shortly thereafter, Reed appeared at a hearing to obtain a search warrant for

11

Burns's house during which he misled the judge into believing that Burns had confessed to shooting her sons. *Id*. 482-83. Based on this misconception, the judge issued the warrant. *Id*. at 483. Before Burns's trial began, the judge suppressed Burns's statements made under hypnosis. *Id*. As a result, Reed dropped the charges, and Burns sued Reed. *Id*.

Evidencing the fact-based nature of the prosecutorial immunity inquiry, the Court parsed Reed's actions into two categories: (1) appearing as a lawyer for the state in a probable cause hearing to obtain a search warrant, and (2) providing legal advice to the police. *Id*. at 487, 492. As to the former, Reed enjoyed absolute immunity. *Id*. at 487. As to the latter, however, the Court held: "[w]e do not believe . . . that advising the police in the investigative phase of a criminal case . . . qualifie[d] [Reed] for absolute immunity." *Id*. at 493. Extending immunity to this activity would eviscerate the rule that a prosecutor's administrative and investigatory acts are not absolutely immune because "[a]lmost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute." *Id*. at 495.

The Court further justified its decision with a review of the relevant policy considerations, finding no common law tradition that would have accorded immunity in this situation, no risk of vexatious litigation if immunity was withheld, and no adequate check to prevent abuse by prosecutors for "out-of-court activities . . . that occur prior to the initiation of a prosecution." *Id*. at 493-96.

12

Following its approach in *Reed*, the Court in *Buckley v. Fitzsimmons* carefully scrutinized prosecutor Fitzsimmons's actions in obtaining a murder indictment of Buckley. 509 U.S. 259, 261, 270 (1993). After a third party confessed to the murder, Buckley sued Fitzsimmons, claiming that Fitzsimmons fabricated evidence to obtain the indictment and made false statements about Buckley in a press conference. *Id*. at 264. The Court held that Fitzsimmons was not entitled to absolute immunity for either act. *Id*. at 275-77. As to the former, the Court held that at the time Fitzsimmons allegedly fabricated the evidence, he had no probable cause to arrest Buckley, no indictment had issued, and no judicial proceedings had begun. *Id*. at 275-76. Thus, Fitzsimmons's actions were purely investigatory and not entitled to absolute immunity. *Id*. As to the latter, the Court noted that at common law, prosecutors were absolutely immune from defamation liability for in-court statements but received only qualified immunity for out-of-court statements. *Id*. at 277. Accordingly, Fitzsimmons was not entitled to absolute immunity for his public statements falsely implicating Buckley. *Id*.

Finally, in *Kalina v. Fletcher*, the Court again parsed the actions of prosecutor Kalina to decide whether she was entitled to absolute immunity. 522 U.S. 118, 120 (1997). Kalina filed three documents to initiate a burglary prosecution of Fletcher, who allegedly stole computer equipment from a school. *Id*. at 120-21. The first two documents — an information and a motion for an arrest warrant — were unsworn. *Id*. at 121. The third — a "Certification for Determination of Probable Cause" — was a sworn document containing two false statements. *Id*. As Fletcher was arrested and jailed before the charges against

13

him were dismissed, he sued Kalina based on her misstatements in the Certification, and Kalina asserted absolute immunity. *Id.* The Court held that Kalina's acts of (1) filing the information and (2) filing the motion for an arrest warrant were protected by absolute immunity, *id.* at 129, but her act of (3) "personally attesting to the truth of the averment" in the Certification was non-prosecutorial because it could have been performed by any competent witness. *Id.* at 129-30.

It is tempting to derive bright-line rules from the aforementioned cases. *Cf.* ERWIN CHEMERINSKY, FEDERAL JURISDICTION 525-26 (4th ed. 2003) (recognizing the uncertainty surrounding the precise scope of prosecutorial immunity but suggesting that in-court activities are generally protected while out-of-court activities, and activities traditionally performed by the police, are not); *see also Buckley*, 509 U.S. at 275-76 (indicating that a prosecutor's post-indictment actions are generally protected by absolute immunity while pre-indictment actions are not). To preserve the fact-based nature of the inquiry, however, the Supreme Court has cautioned against such categorical reasoning. *See, e.g., Imbler*, 424 U.S. at 431 n.33 (prosecutorial immunity extends to "actions preliminary to the initiation of a prosecution and actions apart from the courtroom," but "[a]t some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator" and loses absolute immunity).

*B.    Third Circuit Jurisprudence*

Following the Supreme Court's guidance, our prosecutorial immunity analysis focuses on the unique facts of

14

each case and requires careful dissection of the prosecutor's actions. *See, e.g.*, *Yarris*, 465 F.3d at 136; *Kulwicki*, 969 F.2d at 1463. We have rejected bright-line rules that would treat the timing of the prosecutor's action (*e.g.* pre- or post- indictment), or its location (*i.e.* in- or out-of-court), as dispositive. *See Rose*, 871 F.2d at 346; *Kulwicki*, 969 F.2d at 1463. We have found these considerations relevant, however, to the extent that they bear upon the nature of the function the prosecutor is performing. *See, e.g., Yarris*, 465 F.3d at 138-39; *Kulwicki*, 969 F.2d at 1467.

In *Yarris*, we held that where a prosecutor's role as advocate has not yet begun, or where it has concluded, absolute immunity does not attach. 465 F.3d at 137 (quoting *Spurlock v. Thompson*, 330 F.3d 791, 799 (6th Cir. 2003)). During different stages of Yarris's case, prosecutors allegedly withheld and destroyed exculpatory evidence, fabricated a false confession, and obtained a false statement from a jailhouse informant. *Id*. at 136. Because we could not discern from Yarris's complaint "whether the fabrication of Yarris's confession occurred during the preliminary investigation of an unsolved crime" or "after the [prosecutors] decided to indict Yarris and had begun working as the state's advocates," we declined to extend absolute immunity to this act. *Id*. at 138-39. Similarly, we refused to extend absolute immunity to the prosecutors' act of withholding exculpatory evidence after Yarris's conviction and sentence because we had no proof that the prosecutors remained involved as the state's advocates in "adversarial post-conviction proceedings." *Id*. at 137. Absent such proof, we concluded, the prosecutors were "acting merely as . . . custodian[s] of evidence" and could claim only qualified immunity. *Id*. at 138.

15

By contrast, with respect to the false statement prosecutors obtained from the jailhouse informant, we held that because "Yarris had already been charged," the prosecutors were "acting as advocates rather than investigators" and were entitled to absolute immunity. *Id*. at 139. Although by no means dispositive, *Yarris* teaches that the period during which prosecutors are most likely functioning in a "quasi-judicial" capacity is the time between indictment and dismissal, acquittal, or conviction.[3]

We have also recognized that, presumably by virtue of their egregiousness, some acts fall wholly outside the prosecutorial role no matter when or where they are committed. *See Kulwicki*, 969 F.2d at 1463 (citing *Rose*, 871 F.2d at 346). For example, prosecutors never enjoy absolute immunity for

---

[3] We again caution that this is not a bright-line rule. Depending on the circumstances of each case, some pre-indictment acts — like obtaining, reviewing, and evaluating evidence in preparation for prosecution — and some post-trial acts — like post-conviction appeals — may be advocative and entitle a prosecutor to absolute immunity. *Kulwicki*, 969 F.2d at 1465; *Yarris*, 465 F.3d at 137; *compare Schrob v. Catterson*, 948 F.2d 1402, 1411 (3d Cir. 1991) ("A prosecutor's alleged failure to properly investigate before initiating a prosecution is also conduct within the scope of absolute immunity."), *with Buckley*, 509 U.S. at 276 n.7 (In some situations, in "obtaining, reviewing, and evaluating" the evidence, "the prosecutor no doubt functions as an administrator rather than as an officer of the court.").

deliberately destroying exculpatory evidence. *See Yarris*, 465 F.3d at 136-37.

Likewise, some acts are so far removed from the "judicial phases of litigation" that we do not hesitate to label them administrative. In several cases, for example, we have considered the immunity due to prosecutors who mishandled or improperly withheld property confiscated from criminal defendants. In *Giuffre*, we held that where the prosecutor facilitated the sale of plaintiff's property, which plaintiff forfeited as part of an immunity from prosecution agreement, he performed a strictly administrative function and was not entitled to absolute immunity. 31 F.3d at 1253. Similarly, in *Schrob*, we held that a prosecutor's "management of and negotiations concerning return of the [seized] property [was] not directly related to the judicial process." 948 F.2d 1402, 1419-20 (3d Cir. 1991). Because the prosecutor was instead "acting in an administrative role," we declined to extend absolute immunity. *Id*.

Perhaps most pertinent to the instant appeals, in *Reitz v. County of Bucks*, we considered the immunity due to a prosecutor who delayed in returning seized property in violation of a court order. 125 F.3d 139, 141 (3d Cir. 1997). In *Reitz*, the prosecuting authority seized property purportedly belonging to the defendant who was charged with possessing and delivering marijuana. *Id*. The seizure was conducted pursuant to a state law that authorized the appropriation of property that either facilitated a criminal act or was obtained with the proceeds of a criminal act. *Id*.

17

The defendant's relatives obtained a court order for the return of certain property that did not belong to the defendant. *Id*. at 141-42. Despite the order, the prosecuting authority failed to return the property for nearly a year. *Id*. We held that neither absolute nor qualified immunity protected the prosecutor from liability for this delay because "the prosecutor [had] the obligation to duly comply with a judicial order" and to "avoid violating the rights of others." *Id*. at 147.

III.

With the foregoing principles in mind, we turn to the merits of the instant appeals.

*A.     Nicole Schneyder*

We address first the more difficult case of Nicole Schneyder. We begin by carefully defining the act (or rather omission) that gave rise to Schneyder's suit. *See, e.g., Yarris*, 465 F.3d at 136; *Kulwicki*, 969 F.2d at 1463; *Schrob*, 948 F.2d at 1409.

Schneyder acknowledges that ADA Smith was acting in her prosecutorial capacity when she secured the material witness warrant for Schneyder's arrest. *See Betts v. Richard*, 726 F.2d 79, 81 (2d Cir. 1981); *Daniels v. Keiser*, 586 F.2d 64, 68 (7th Cir. 1978). Schneyder alleges, however, that Smith's failure to notify Judge Means (per his order and per local custom) that the *Overby* case had been continued was an administrative oversight. Once Smith performed this clerical duty, Schneyder

18

concedes, Smith was free to advocate any position she wanted with regard to the propriety of Schneyder's release.

Smith, on the other hand, characterizes her act as failing "to seek Ms. Schneyder's release from custody when the *Overby* case was continued." This "act of prosecutorial discretion," Smith argues, cannot be carved up into its advocative and administrative components. As Smith's counsel contended at oral argument, even a plainly prosecutorial act like filing a bill of information involves predicate administrative acts that any clerk could perform, such as printing and binding the documents. In other words, the fact that some administrative acts necessarily accompany nearly all prosecutorial acts should not strip prosecutors of immunity.

When viewed from Smith's suggested level of generality, her act might reasonably be characterized as an out-of-court "effort to control the presentation of [a] witness' testimony," an act the Supreme Court viewed as advocative on the facts of at least one case. *See Imbler*, 424 U.S. at 431 n.32. In *Imbler*, prosecutor Pachtman asked the police to refrain from questioning his primary identification witness about an unrelated bad-check charge until the witness testified against Imbler. *Id.* at 411, 431 n.32. Imbler claimed this request was "investigative activity because it was a direction to police officers engaged in the investigation of a crime." *Id.* at 431 n.32. The Court disagreed and concluded that Pachtman was performing "a task fairly within his function as an advocate." *Id.*

We do not believe this parenthetical conclusion was intended as a categorical rule. As we noted previously, the

19

Supreme Court has repeatedly instructed that immunity determinations cannot be made without reference to the unique facts of each case, and we find the facts of Schneyder's case distinguishable.

Here, ADA Smith's act occurred during a prolonged and clearly delimited period of judicial inactivity, whereas Pachtman's request that the police refrain from questioning his witness occurred "during a courtroom recess" from the trial in which the witness was to testify. *Id*. Pachtman's efforts to control the presentation of his witness's testimony were thus more "intimately associated with the judicial phase of the criminal process" than Smith's. *Id*. at 430. In addition, Smith disobeyed the explicit instructions of the court when she failed to notify Judge Means that the proceedings in which Schneyder was to testify had been delayed, whereas Pachtman was under no court-imposed obligation to permit the police to question his witness. As a result, Pachtman's act involved more discretion than Smith's. Thus, even if we viewed Smith's act at her suggested level of generality (which, as we explain below, would be inappropriate), we would find her act less worthy of absolute immunity than Pachtman's.

The foregoing discussion is largely academic because for the distinction between advocative and administrative acts to be useful, we must narrowly define the act at issue. After all, "[a]lmost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute." *Burns*, 500 U.S. at 495. Similarly, almost any action by a prosecutor, including the dispatch of purely

administrative tasks, can be said to be in some way related to more central prosecutorial functions. *See Guzman-Rivera v. Rivera-Cruz*, 55 F.3d 26, 29 (1st Cir. 1995) ("The prosecutorial nature of an act does not spread backwards like an inkblot, immunizing everything it touches."). It was Smith's burden to establish her entitlement to absolute immunity, *Light*, 472 F.3d at 80-81, and in light of our preference for a "meticulous analysis" of the prosecutor's actions, *id*. at 79, we believe Schneyder's characterization of Smith's act is more appropriate. Indeed, we find that the distinction between informing the court about the status of a detained witness (Schneyder's characterization[4]) and affirmatively seeking that witness's release (Smith's characterization[5]) is a principled one.

---

[4] In her briefs, Schneyder characterizes Smith's act as, *inter alia*, failing to: "notify authorities that plaintiff . . . remained in custody," "notify authorities that [Smith] ha[d] a material witness in custody," "notify authorities that plaintiff would no longer be needed as a witness," and "notify the authorities that the underlying criminal case had been continued and that plaintiff would not be needed as a witness for another four months."

[5] In her brief, Smith characterizes her act as, *inter alia*, neglecting to: "secure Ms. Schneyder's immediate release from custody," "seek Ms. Schneyder's release from custody," "petition[] for the withdrawal of [the material witness] warrant," and "advocat[e] for the release of [a] witness[]."

21

Having adopted Schneyder's characterization, it follows that Smith is not entitled to absolute prosecutorial immunity.[6] We find that Smith's obligation to inform Judge Means that *Overby* had been continued — and that Schneyder remained incarcerated — was primarily administrative, especially in light of Judge Means's explicit order that he be advised of any delay in the *Overby* proceedings. Smith's duty to advise Judge Means of these facts required no advocacy on her part.

Our case law bolsters this conclusion. In *Yarris*, for example, we considered the timing of the prosecutor's actions to be relevant in determining their nature, observing that pre-indictment and post-conviction actions are more likely administrative than advocative. *See Yarris*, 465 F.3d at 137. Here, although an indictment had issued, the *Overby* trial had been continued from February 2, 2005, to May 25, 2005, a period of nearly four months. Smith's failure to act occurred during this period of judicial inactivity. Although the *Overby* trial was not finally terminated, it was suspended for a clearly delimited period of time, casting serious doubt on Smith's claims that her actions during this period remained "intimately associated with the judicial phase" of the litigation. *Imbler*, 424 U.S. at 430.

Additional facts alleged in Schneyder's complaint further support our conclusion that Smith's omission was not "quasi-

_____

[6] We leave to the District Court on remand the question whether Smith is entitled to qualified immunity. *See Imbler*, 424 U.S. at 430-31; *Carter*, 181 F.3d at 356.

22

judicial." First, Schneyder alleges that Judge Means twice instructed Smith to notify him if the *Overby* case was continued so that he could release Schneyder. We can imagine few circumstances under which we would consider the act of disobeying a court order or directive to be advocative, and we are loath to grant a prosecutor absolute immunity for such disobedience. *See Reitz*, 125 F.3d at 147; *White by Swafford v. Gerbitz*, 860 F.2d 661, 665 n.4 (6th Cir. 1988). *But see Webster v. Gibson*, 913 F.2d 510, 513-14 (8th Cir. 1990); *Ybarra v. Reno*, 723 F.2d 675, 679 (9th Cir. 1984) (prosecutor's dereliction of a duty that "arise[s] from his role as an officer of the court . . . cannot be construed as only administrative or investigative").

Second, Schneyder alleges that it was the custom and practice in Philadelphia County to assign sole responsibility for tracking and monitoring detained witnesses to the District Attorney's Office and to individual prosecutors. This custom is consistent with federal criminal practice:

> Supervising Detention Pending Trial. (1) In general. To eliminate unnecessary detention, the court must supervise the detention within the district . . . of any persons held as material witnesses. (2) Reports. An attorney for the government must report biweekly to the court, listing each material witness held in custody for more than 10 days pending indictment, arraignment, or trial. For each material witness listed in the report, an attorney for the government must state why the witness should not be released

23

with or without a deposition being taken under
Rule 15(a).

FED. R. CRIM. P. 46(h). This rule, like Judge Means's order,
obligates the prosecutor to keep the court informed of the status
of detained material witnesses. The gist of the provision — the
biweekly reporting requirement — is plainly administrative.
The prosecutor is required to "list" all detained witnesses, not to
advocate any particular action with regard to those witnesses.[7]

Moreover, Rule 46(h), which is intended to "eliminate
unnecessary detention," suggests that *10 days* is the upper limit
for holding material witnesses without notice to the court and a
written justification for "why the witness should not be
released." Here, Smith was held for over *50 days* without notice
to the court or a justification of any kind from Smith.

In short, it is a judicial function — the function of the
courts — not a prosecutorial function, to determine whom to
incarcerate and for what length of time. On the particular facts
of this case, we conclude that once *Overby* was continued,

---

[7] The second part of the provision, of course, is plainly
advocative, requiring prosecutors who wish to keep witnesses
detained to "state why the witness[es] should not be released."
Here, as discussed, Schneyder does not contend that Smith was
obligated to undertake this sort of advocacy. She argues only
that Smith was obligated to inform Judge Means that *Overby*
had been continued.

Smith's failure to notify the court about Schneyder's custodial status was an administrative oversight. Accordingly, we hold that Smith was not entitled to absolute prosecutorial immunity.

*B.      Korvel Odd*

We turn now to the easier case of Korvel Odd. As with Nicole Schneyder, we begin by defining the act in question. *See, e.g., Yarris*, 465 F.3d at 136; *Kulwicki*, 969 F.2d at 1463; *Schrob*, 948 F.2d at 1409. According to Odd, ADA Malone failed to notify the relevant authorities that Odd remained incarcerated despite the dismissal of the *Way* case in which Odd was to testify.[8] Malone, by contrast, characterizes his act as "omitting to see to the release" of Odd after the *Way* prosecution was dismissed. For the reasons discussed previously, we accept Odd's characterization of Malone's act.

Odd's case presents a relatively clear example of a situation in which the prosecutor's role as an advocate for the state had concluded. *Yarris*, 465 F.3d at 137; *see also Ybarra v. Reno*, 723 F.2d 675, 679 (9th Cir. 1984) ("In acting either to preserve or release evidence, the primary [immunity]

---

[8] Odd also faults Malone for "failing to take any steps to have plaintiff released from custody" and neglecting to "take the necessary steps to put into motion the process to release plaintiff." The record shows that the only step necessary to effectuate Odd's release was for Malone to notify Judge Neifield of his incarceration. As we explain, this step required no advocacy on Malone's part.

25

consideration, viewed objectively, is whether the prosecutor needs the evidence *to prosecute*.") (emphasis added). Whereas the case in which Schneyder was to testify was merely *continued*, the case in which Odd was to testify was *dismissed*.

As the Court of Appeals for the Second Circuit has stated:

> Keeping a person in state custody *after* the termination of all charges against him has nothing to do with conducting a prosecution for the state. Since the handling of a prisoner after the complete conclusion of all criminal charges is not a prosecutorial task but rather an administrative one, the district attorney defendants are entitled only to the protection of qualified immunity for any involvement in [plaintiff's] seemingly delayed transfer back into federal custody after the final dismissal of the state charges against him.

*Pinaud v. County of Suffolk*, 52 F.3d 1139, 1151 (2d Cir. 1995) (emphasis in original). Because we agree with the Second Circuit's reasoning, it necessarily follows that keeping a *third-party witness* in state custody after the termination of the proceeding in which he was to testify has nothing to do with conducting a prosecution for the state. *See Gerbitz*, 860 F.2d at 665 n.4 (stating in dicta that neither absolute nor qualified immunity would protect a prosecutor who "failed to act timely in securing [a material witness's] release after being ordered by the court" to do so). Instead, this is an administrative oversight

26

by the prosecutor that does not warrant absolute immunity. *See Imbler*, 424 U.S. at 430-31.

An analogy to our property seizure cases is illustrative. We have concluded that where a court determined that seized property was not related to the criminal defendant's drug activities, the prosecutor's delay in returning that property in violation of the court's order was "incomprehensible," so the prosecutor was not entitled to absolute immunity. *Reitz*, 125 F.3d at 147. Here, when Judge Neifield dismissed the *Way* case, Odd's testimony, like the property in *Reitz*, was no longer relevant to an ongoing prosecution. Nevertheless, in derogation of the terms of the "judge-only" warrant, ADA Malone failed to inform Judge Neifield that Odd was detained. If a prosecutor is not entitled to absolute immunity for improperly retaining a chattel, *a fortiori* he is not entitled to absolute immunity for improperly retaining a person.

The fact that the *Way* prosecution was terminated is also critical because it undermines Malone's suggestion that he would have had to engage in advocacy to secure Odd's release. Indeed, once Judge Neifield discovered that Odd remained incarcerated, she was "furious" and immediately released him without hearing any "advocacy" from anyone. The only act necessary to secure Odd's release was notifying Judge Neifield that he remained in jail. Malone's failure to perform this simple administrative act caused Odd's unnecessary detention.

In short, the principal distinction between this case and Nicole Schneyder's is that here, the case in which Odd was to testify was terminated instead of continued. As we have

27

explained, this distinction cuts in Odd's favor. Accordingly, having concluded that ADA Smith was not entitled to absolute prosecutorial immunity, we readily conclude that ADA Malone was not entitled to absolute prosecutorial immunity.

IV.

In addition to the administrative nature of the prosecutors' actions, we note that the policy considerations underlying prosecutorial immunity counsel against recognizing absolute immunity in these cases.

To decide whether to extend absolute immunity under § 1983, the Supreme Court considers whether: (1) there is a common law tradition of according immunity in similar situations; (2) denying immunity would subject the prosecutor to the chilling influence of vexatious lawsuits; and (3) there exist adequate checks on prosecutorial abuse other than individual suits against the prosecutor. *See Imbler*, 424 U.S. at 421-29; *Burns*, 500 U.S. at 492-96; *Kulwicki*, 969 F.2d at 1463.

Here, neither the District Court nor the parties identify a common law tradition of extending absolute immunity to a prosecutor for failing to notify the court of the status of a detained witness. Indeed, as Justice White observed, "[t]here was no absolute immunity at common law for prosecutors other than absolute immunity from suits for malicious prosecution and defamation." *Imbler*, 424 U.S. at 441 (White, J., concurring). Plaintiffs' complaints cannot be fairly analogized to either of these actions because Plaintiffs were neither prosecuted nor defamed. Both were unindicted third-party witnesses.

28

Second, it is unlikely that denying absolute immunity in these cases would interfere with the prosecutors' independent decisionmaking by exposing them to vexatious litigation. Accepting Plaintiffs' allegations as true, as we must, the ADAs had no decisions to make. ADA Smith was required by court order (and perhaps by local custom) to notify Judge Means that *Overby* was continued, and ADA Malone was required by the judge-only warrant (and perhaps by local custom) to notify Judge Neifield that Odd had been detained. After the prosecutors performed these ministerial tasks, it was the *judges'* decision whether to release Plaintiffs.

We also note that these cases differ significantly from most cases involving prosecutorial immunity. Here, unindicted third-party witnesses, not criminal defendants, are suing the ADAs. Although one can imagine the flood of litigation that would ensue if every *defendant* who thought he had been wronged by a prosecutor could sue, a similar result is not likely to follow from permitting detained *witnesses* to sue prosecutors. Furthermore, denying the ADAs absolute immunity does not mean they are without protection from vexatious suits. Indeed, they may still be entitled to qualified immunity if their actions were objectively reasonable in light of the constitutional rights affected. *Carter*, 181 F.3d at 356.

Finally, we observe that by virtue of their status as third-party witnesses, Plaintiffs are not entitled to the protections available to criminal defendants, including the appellate process. Indeed, the failure of the ADAs to notify anyone of Plaintiffs' status assured that not even the warrant-issuing judges would review the propriety of their continued detention, thus short-

29

circuiting the "crucible of the judicial process." *Burns*, 500 U.S. at 496. These policy considerations further support our holding that neither Smith nor Malone is entitled to absolute immunity.

V.

In sum, we conclude that both Smith and Malone failed to perform a fundamentally administrative task, *viz*., notifying the warrant-issuing judges that Schneyder and Odd remained incarcerated after it was clear that their testimony would not be needed for quite some time, if ever. We also find that the policies underlying the recognition of prosecutorial immunity do not apply with the same force in these cases because the aggrieved persons are unindicted third-party witnesses rather than criminal defendants.

For the foregoing reasons, we hold that both Schneyder and Odd have stated § 1983 claims against ADAs Smith and Malone. Accordingly, we reverse the District Court's dismissal of Schneyder's claim against Smith, affirm the District Court's denial of Malone's motion to dismiss Odd's claim, and remand both matters for further proceedings consistent with this opinion.