# CIRCUIT COURT OF THE CITY OF ROANOKE

Commonwealth of Virginia

v.

Justin Lyn Musser

## Case No. CL10-1276

February 21, 2011

BY JUDGE CLIFFORD R. WECKSTEIN

This is a homicide case. By pretrial motion, the Attorney for the Commonwealth seeks permission to save money and inconvenience by presenting the testimony of Christena Roberts, M.D., through two-way videoconferencing technology. The parties' have entered into a stipulation about the proposed testimony. It is attached and incorporated. The witness, who performed an autopsy in Virginia, now lives and works in Florida. Her testimony would be presented to the jury "live" and "in real time." The defendant opposes the motion.

The videoconferencing technology that would be employed enables the witness to simultaneously see and be seen by and to hear and be heard by the defendant, the jury, judge, counsel, and others present in the courtroom. The witness is sworn by an authorized officer in the witness's physical presence and then examined and cross-examined in the same way she would be if she were physically on the witness stand in the trial courtroom. The witness is, in today's vernacular, virtually present.

The defendant's objection is based on the Confrontation Clause of the Sixth Amendment. "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This Sixth Amendment right is applicable to the states under the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403-06 (1965). The Supreme Court has not expressly addressed the question of when, or to what extent, two-way videoconference testimony of a prosecution witness in a criminal case might comport with the Confrontation Clause, although the Justice who has authored the Court's most significant recent Confrontation Clause opinions has observed that "Virtual confrontation might be sufficient to protect virtual Constitutional rights. I doubt whether it is sufficient to protect real ones." *See* Amendments to Rule 26(b) of the Federal Rules of Criminal Procedure, 207 F.R.D. 89, 94 (2002) (statement of Scalia, J.).

"[T]he Confrontation Clause," the Court explained in *Coy v. Iowa*, 487 U.S. 1012 (1987), "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Id.* at 1016. That decision left "for another day . . . the question whether any exceptions exist to [that]

'irreducible literal meaning of the Clause'." *Id.*, 487 U.S. at 1021 (citation omitted).

That question was answered in *Maryland v. Craig*, 497 U.S. 836 (1990). Under its precedents, the Court held, "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial [but] only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850. The *Craig* standard requires "a case-specific finding of necessity." *Id.* at 860. The Commonwealth argues, in the alternative, that the *Craig* standard does not apply in this case and that it meets that standard.

*Craig*, as the Commonwealth points out, involved one-way audio-video transmission, not the two-way videoconferencing that is proposed in the case at bar. Relying on the U.S. Court of Appeals for the Second Circuit, the Commonwealth argues that the *Craig* standard is inapposite. *See United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999), *cert. denied*, 528 U.S. 1114 (2000). "[T]he Supreme Court," the Second Circuit said in *Gigante*, "crafted this standard to constrain the use of one-way closed-circuit television, whereby the witness could not possibly view the defendant. Because [U.S. District] Judge [Jack B.] Weinstein employed a two-way system that preserved the face-to-face confrontation celebrated by *Coy*, it is not necessary to enforce the *Craig* standard in this case." *Id.* at 81. *But see United States v. Yates*, 438 F.3d 1307, 1313 (11th Cir. 2006) (*en banc*) ("We reject this reasoning. The *Gigante* trial court should have applied *Craig*."); *compare United States v. Abu Ali*, 538 F.3d 210, 242-43 (4th Cir. 2008), *cert. denied sub nom. Ali v. United States*, 129 S. Ct. 1312 (2009) (discussed below).

The defendant in *Gigante* was, the government alleged, "the boss of the Genovese family," one of the five organized crime families of which the New York Mafia is composed. *Gigante*, 166 F. 3d at 78. Peter Savino, "a former associate of the Genovese family," *Id.*, was described as a crucial witness against Gigante. At the time of Gigante's trial, Savino was in the Federal Witness Protection Program after a decade of "cooperating" with the government and "in the final stages of an inoperable, fatal cancer, and was under medical supervision at an undisclosed location." *Id.* at 79. After hearing testimony from physicians, the trial judge found by clear and convincing evidence that it would be medically unsafe for the witness to travel to New York for the trial. *Id.* at 79-80. Gigante himself was in ill health and unable to travel. *Id.* at 81.

The Second Circuit, acknowledging that "[t]here may well be intangible elements of the ordeal of testifying in a courtroom that are reduced or even eliminated by remote testimony," held that "two-way closed-circuit television testimony does not necessarily violate the Sixth Amendment." *Id.* at 81. Such testimony, the Court cautioned, "should not be considered a

commonplace substitute for in-court testimony by a witness." *Id.* However, the Court held, "Upon a finding of exceptional circumstances, such as were found in this case, a trial court may allow a witness to testify via two-way closed-circuit television when this furthers the interest of justice." *Id.* Leaving aside the question of whether the case at bar is one in which there are comparable "exceptional circumstances," the legal landscape has changed since *Gigante.*

Since *Gigante,* the Supreme Court has decided *Crawford v. Washington,* 541 U.S. 36 (2004); *Davis v. Washington,* 547 U.S. 813 (2006); and *Melendez-Diaz v. Massachusetts,* 557 U.S. ___, 129 S. Ct. 2527, 2531 (2009). These decisions, it is fairly said, "have greatly expanded the right of the accused in criminal prosecutions to confront the witnesses against them." G. Michael Fenne, "Today's Confrontation Clause (after *Crawford* and *Melendez-Diaz*)," 43 Creighton L. Rev. 35 (December 2009).

*Crawford* overruled *Ohio v. Roberts,* 448 U.S. 56 (1980). Under *Roberts,* as Justice Scalia notes in the Court's *Crawford* opinion, courts erroneously viewed reliability as the keystone of Confrontation Clause analysis. *See Crawford,* 541 U.S. at 50-62. (Indeed, the *Gigante* court, having distinguished *Craig,* seems then to have based its decision on a reliability analysis. *See Gigante,* 166 F.3d at 80.) The *Crawford* Court's commentary is somewhat caustic: "Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." *Crawford,* 541 U.S. at 62. "Reliability is an amorphous, if not entirely subjective, concept. . . . Some courts wind up attaching the same significance to opposite facts. . . . The Virginia Court of Appeals found a statement more reliable because the witness was in custody and charged with a crime (thus making the statement more obviously against her penal interest), *see Nowlin v. Commonwealth,* 40 Va. App. 327, 335-38, 579 S.E.2d 367, 371-72 (2003), while the Wisconsin Court of Appeals found a statement more reliable because the witness was not in custody and not a suspect, *see State v. Bintz,* 257 Wis. 2d 177, 187, 650 N.W.2d 913, 918." *Crawford,* 541 U.S. at 63.

Since *Crawford,* academic commentators have collected and analyzed relevant state and federal court decisions to consider whether and under what circumstances the presentation of prosecution testimony by two-way videoconferencing will pass muster under the Supreme Court's evolving Confrontation Clause jurisprudence. In addition to Professor Fenne's article, 43 Creighton L. Rev. 35, *see* Oliver M. Gold, Note and Comment, "Trimming Confrontation's Claws: Navigating the Uncertain Jurisprudential Topography of the Post-*Melendez-Diaz* Confrontation Clause," 43 Loy. L.A. L. Rev. 1431 (Summer 2010); Anthony Garofano, "Avoiding Virtual Justice: Video-Teleconference Testimony in Federal Criminal Trials, 56 Cath. U.L. Rev. 683 (Winter 2007); *also see* Nancy

Gertner, "Videoconferencing: Learning Through Screens," 12 Wm. & Mary Bill of Rts. J. 769 (2004). Cases, before and after *Crawford*, are comprehensively collected in an annotation, "Closed-circuit Television Witness Examination," 61 A.L.R.4th 1155. (According to Lexis-Nexis, "The ALR databases are made current by the weekly addition of relevant new cases as available from the publisher.")

Each of these commentators, like the court in every on-point post-*Crawford* case this court has discovered, has concluded that two-way live videoconferencing technology is not, in itself, a Constitutionally satisfactory proxy for the defendant's right to meet face-to-face in the trial courtroom witnesses who testify for the prosecution; but, nonetheless, that the defendant's right to confront a prosecution witness may be satisfied by two-way videoconference testimony, without a physical, face-to-face confrontation at trial, but only if the defendant consents, or the prosecution first meets a case-specific burden of proving a significant need to proceed by videoconference, and that protections are in place to otherwise assure the reliability of the testimony. Post-*Crawford* commentators and cases are uncertain about whether the standard for proving significant need for two-way videoconferencing will be the *Craig* "necessary to further important public interest" standard, or some other heightened standard.

An example is the standard set forth in Rule 15(a)(1) of the Federal Rules of Criminal Procedure: "A party may move that a prospective witness be deposed in order to preserve testimony for trial. The court may grant the motion because of exceptional circumstances and in the interest of justice." In the *Gigante* case, upon which the Commonwealth relies, the Second Circuit applied the Rule 15 standard. *Gigante*, 166 F.3d at 81. The three judges who dissented from the Eleventh Circuit's *en banc* decision in *Yates* proposed alternative standards, or alternative ways of looking at *Craig*. *See Yates*, 438 F. 3d at 1319-28 (Tjoflat, J., dissenting, joined by Marcus and Birch, JJ.) and at 1328 (Marcus, J., dissenting, joined by Tjoflat and Birch, JJ.).

The academic commentators cited above all predict that the *Craig* standard will apply.

The *Craig* standard applies to criminal cases tried in federal courts in this Commonwealth. In 2008, the United States Court of Appeals for the Fourth Circuit, in a case arising from the Eastern District of Virginia, approved District Judge Gerald Bruce Lee's decision to allow the presentation of prosecution testimony by two-way videoconference deposition. In doing so, the Court held that *Craig* supplied the appropriate "road map." *Abu Ali*, 538 F.3d at 240-42.

Defendant Abu Ali was tried and convicted of crimes "arising from his affiliation with an al-Qaeda terrorist cell located in Medina, Saudi Arabia, and its plans to carry out a number of terrorist acts in this country." *Id.* at 221. The government sought the testimony of several Saudi government

officials, including two whose testimony was "[o]f critical importance." *Id.* at 240. The American court had no power to compel Saudi Arabian citizens, living in Saudi Arabia, to appear and testify. The Saudi Arabian government declined a formal request for the witnesses to travel to the United States to testify at trial, but offered to make them available for depositions in Saudi Arabia's capital city. *Id.* at 239:

For cogent reasons, defendant Abu Ali could not travel to Saudi Arabia for the depositions. "Given these practical difficulties, witnesses who could only testify in Saudi Arabia and a defendant unable to go to Saudi Arabia, the trial court attempted to fashion deposition procedures that would best preserve Abu Ali's Confrontation Clause right." *Id.* Two defense attorneys and two prosecutors attended the depositions in Saudi Arabia, while a third defense attorney sat with Abu Ali, in a courtroom in Alexandria, Virginia. A live two-way video link connected the two sites. The defendant and the lawyer in Virginia could see and hear the witnesses as they testified; the witnesses could see Abu Ali. A court reporter transcribed the proceedings in real time; the witnesses and defendant were videotaped, so that the jury could see their reactions. Judge Lee presided, from the courtroom in Alexandria, ruling on objections as they arose. The defendant was able to communicate by cell phone with his attorneys in Saudi Arabia. *Id.* at 239-40. His lawyers participated fully in the deposition, questioning the witnesses and frequently making objections. *Id.*

Explaining how the *Craig* "necessary to further an important public policy" standard was met, the Fourth Circuit, speaking through Judge Wilkinson, noted that "the Supreme Court has long acknowledged that no governmental interest is more compelling than the security of the Nation." *Id.* at 242. "Insistence on face-to-face confrontation," he wrote, "may in some circumstances limit the ability of the United States to further its fundamental interest in preventing terrorist attacks. *Id.*

The Court continued: "The continuing threat of international terrorism highlights the importance of this interest: the 'government has no more profound responsibility than the protection of Americans, both military and civilian, against additional unprovoked attack.' This case — in which the defendant is charged with crimes targeting American civilians and the President of the United States — plainly implicates this vital interest. This is not to suggest that a generalized interest in law enforcement is sufficient to satisfy the first prong of *Craig*. *Craig* plainly requires a public interest more substantial than convicting someone of a criminal offense. The prosecution of those bent on inflicting mass civilian casualties or assassinating high public officials is, however, just the kind of important public interest contemplated by the *Craig* decision." *Id.* (citations omitted). The *Abu Ali* court tipped its hat to *Gigante*, citing that case when noting that a two-way video link provided "a protection not available in *Craig*." *Abu Ali*, 538 F.3d at 242.

In the case at bar, Dr. Roberts, the medical examiner, is available to come to Virginia and testify in open court, in the personal presence of the defendant, the jury, counsel, and the court. The Commonwealth attached to its motion an undated letter from Dr. Roberts, notifying Commonwealth's Attorneys that her last date as a state employee would be September 15, 2010, and stating (among other things) that "I care about.the decedents and families in the cases that I have worked on and will be delighted to return to testify."

The Commonwealth bases its request to present the medical examiner's testimony by two-way videoconference on cost savings — $5,000 or more in cost savings — trial efficiency, and the convenience of the witness. In its *Memorandum in Support of Motion to Allow Testimony by Video*, the Commonwealth says that "both prongs of the *Craig* test are satisfied.

> In this time of budget reduction, the Commonwealth has a strong public policy interest to appropriately minimize its expenses. The cost of arranging for Dr. Roberts's testimony could be greatly minimized in this trial and several others by using two-way videoconferencing. It is financially burdensome, impractical, and unnecessary for Dr. Roberts to travel to Roanoke to testify when video conferencing is available. . . . Dr. Roberts has located a facility near to her home where she can arrange for the videoconferencing.

*Id.* at 3.

The Commonwealth's Attorney, in the same passage, states that "This Court has invested in video-conferencing technology." Although it is understandable that the Commonwealth's Attorney would think that this is the case, the Circuit Court of the City of Roanoke does not yet have built-in on-site videoconferencing technology. An outside contractor has, on occasion, been hired to provide that technology for trials and hearings in this court. Frugality is an important public policy. *See, e.g.*, Virginia Code §§ 2.2-1500 to 2.2-1520 (planning and budgeting; six-year capital outlay plan). "But the cost of protecting a constitutional right cannot justify its total denial." *Bounds v. Smith*, 430 U.S. 817, 825 (1977). On February 16, 1951, Chief Judge Learned Hand of the Second Circuit was the keynote speaker for the 75th anniversary celebration of The Legal Aid Society of New York. During that speech, he said: "If we are to keep our democracy, there must be one commandment: Thou shalt not ration justice."

Our jurisprudence does not ration constitutional rights based on the financial cost of preserving and enforcing those rights. *See Griffin v. Illinois*, 351 U.S, 12 (1956). Rather the contrary is the case: "to secure those rights, governments are instituted among men." *See Declaration of*

*Independence,* ¶ 2; *Ake v. Oklahoma,* 470 U.S. 68, 79 (1985) (state's interest in its economy does not weigh significantly against protecting defendant's constitutional rights; *see* other cases cited and discussion in opinion); *Argersinger v. Hamlin,* 407 U.S. 25 (1972); *Husske v. Commonwealth,* 252 Va. 203, 476 S.E. 2d 920 (1996). The court has discovered no case — and the Commonwealth cites none — in which the cost of presenting live testimony was used as a justification for presenting the testimony by videoconference. *Also see, e.g., People v. Buie,* 2011 Mich. App. LEXIS 22 (Mich. App. Jan. 11, 2011); *e.g.,* Gertner, 12 Wm. & Mary Bill of Rts. J. 769. A finding that it is always more economical to use videoconferencing than to bring a witness from Florida (or across the state, or across the city) seems to this court neither a case-specific rationale for eliminating the defendant's right of face-to-face confrontation, nor a showing of "necessity."

For the foregoing reasons, the court finds that the *Craig* standard applies and that the Commonwealth has failed to meet its *case-specific burden* of showing that denial of the defendant's right to face-to-face confrontation at trial is *necessary* to further an important public policy. The court therefore denies the motion to present the medical examiner's testimony by two-way videoconference.

As I indicated on the record when the Commonwealth's Attorney first raised this issue, I have presided in at least one criminal trial in which two-way videoconferencing technology was used to present similar testimony — albeit with consent of the defendant — and perceived that it worked well. It is likely that, under *Ohio v. Roberts,* which was overruled by *Crawford,* my decision would have been different from the one I communicate in this opinion letter.