McKEE, Chief Judge,
concurring.
I agree wholeheartedly with the majority’s opinion and therefore join my colleague’s analysis in its entirety. I write separately merely to suggest that the issue before us is not as complex as the majority’s very methodical analysis may imply. Although the rather complex subtlety and *335 nuance of the majority opinion is extraordinarily useful in resolving this issue, it should not give rise to an argument that a reasonable prosecutor could not have anticipated today’s result.
The central inquiry before us is simple: would a reasonable prosecutor have known that detaining a material witness for 48 days after a trial has been continued may have been contrary to the wishes of the authorizing court, and that this additional detention violated the witness’ constitutional rights? See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) It takes neither a panel of federal judges nor a prescient prosecutor to know that the answer to both questions is a resounding “yes.”
I.
There are very important reasons to afford prosecutors immunity from law suits. As the Supreme Court has explained, immunity allows a prosecutor to focus his/her energy and attention on the trial at hand as opposed to having to worry about being forced to “answer in court each time [] a person charged him[/her] with wrongdoing.” Imbler v. Pachtman, 424 U.S. 409, 425, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). It is just as clear that there are also very important policies that counsel against allowing prosecutors to act with impunity by taking it upon themselves to determine when, and if, someone who has been properly incarcerated should be released. This is especially true when additional detention may well be contrary to the instructions of the judge who authorized the initial seizure and detention, and when the circumstances suggest that the judge would no longer allow the person to be incarcerated.
The Supreme Court has cautioned that, “[t]he public trust of the prosecutor’s office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages.” Id. at 425-26, 96 S.Ct. 984. However, it is no less certain that public trust of that office as well as of the Constitution that the office is sworn to uphold would suffer if prosecutors were allowed to take it upon themselves to decide when and if someone should be released from incarceration.
Here, Smith clearly took it upon herself to decide when and if Schneyder would be released.[1] After Schneyder’s family repeatedly called Smith asking when Schneyder could leave state custody, Smith informed them, “/’to not going to let her go until this matter is resolved.” (App.257) (emphasis added). The umbrella of immunity surely was not intended to shelter such conduct. The power to release Schneyder did not reside in Smith nor in any other prosecutor. It resided in the court, and it continued to reside there after the Overby trial was postponed. Smith may well have been troubled by the prospect of releasing Schneyder and risking an acquittal of Overby, but that was not her decision to make. It is certainly not a novel precept of Anglo American jurisprudence to suggest that once the Overby trial was continued, Smith should have made any concerns about Schneyder’s availability known to Judge Means so that the court could then decide whether it was still reasonable to detain Schneyder under the Fourth Amendment.[2]
*336 II.
Smith should have realized that holding Schneyder even after the Overby trial was postponed was contrary to the authority Judge Means had afforded her. At the bail hearing, Judge Means clearly stated on the record that he was uneasy with incarcerating a person who was not accused of any crime in order to obtain her testimony at a subsequent trial. He stated, “I don’t like setting bail on people who are not accused of a crime.” (App.55-56). He also stated, “if the case breaks down, let me know early and I’ll let you out, Ms. Schneyder.”[3] (App.55-56).
Judge Means had every reason to believe that Schneyder would only be held in custody for a few weeks because Smith told the court that the trial would begin “six days from today” and that it would be a “ten-day trial at most.” (App.55-56). Indeed, it is difficult to read this transcript and conclude anything other than that the judge believed that he was only authorizing Schneyder’s detention for a couple of weeks — the time it would take to start and finish the Overby trial.
Smith’s actions were also an unreasonable usurpation of the judicial authority to detain a material witness in light of the prevailing custom in the prosecutor’s office. Judge Means testified that the “practice and custom in the Court of Common Pleas in these situations [involving material witness detentions] is for the prosecutor to bring the matter back to court to address any outstanding issues.” (App.215). That custom is also evidenced by testimony from Edward McCann, then-Chief of the District Attorney’s Homicide Unit and Smith’s own supervisor. He stated that “it’s a well-known office policy and Homicide Unit policy” that Smith would have a responsibility to notify him if a case had been continued and a material witness was held in custody. (App.84). The policy existed since McCann “came into the DA’s office [in 1989].” (App.84, 90). Thus, a reasonable prosecutor should have realized that she could not take it upon herself to decide when a detained witness would be released from custody.[4]
*337 I do not, of course, suggest that the policy of a prosecutor’s office can give rise to a right of constitutional import under § 1983. However, there was nothing unreasonable or novel about Judge Means’ request to be told of any continuance in the Overby trial because Means was only authorizing Schneyder’s detention for the brief period he had been told was necessary to obtain Schneyder’s testimony there.
III.
Nothing we say here suggests that a judge in this situation would not have the authority to authorize continued incarceration of a material witness if the trial s/he is to testify at is postponed. Had Judge Means been properly informed of the continuance, he could have again considered the circumstances and competing interests (including Schneyder’s liberty interest) and could have concluded — based upon all the circumstances — that Schneyder’s continued incarceration was both justified and appropriate.
However, that is not the point. The fact that Schneyder may have remained in custody even if Smith had told the court of the continuance does not mean that Smith is somehow entitled to immunity. Rather, the point of our holding today is quite simply that any reasonable prosecutor should know that the authority to incarcerate belongs to the court, not the prosecutor,[5] and that one who disregards that basic tenet violates a clearly established constitutional right. I think it is helpful to look beneath the intricacies and algebraic equations that assist my colleagues’ analysis, because our holding results in nothing more surprising than that extraordinarily unremarkable conclusion. Neither our holding today, nor the reactions of the judges whom I reference in footnote4 should come as a surprise to anyone with even a rudimentary familiarity with the restrictions imposed on the power of the state by the Fourth Amendment, or the distinction between the prosecutorial function and judicial authority.

. Since we are reviewing a motion to dismiss, we must accept the evidence in the light most favorable to the plaintiff, and draw all reasonable inferences in her favor. See Giuffre v. Bissell, 31 F.3d 1241, 1251 (3d Cir.1994).

. Nor am I concerned that Smith could not have foreseen a Fourth Amendment violation because additional detention appeared to be a due process issue. See Bell v. Wolfish, 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 *336 (1979), and Maj. Op. at 320-21. Regardless of the label, the foundation of the required analysis is surely the same under § 1983. Any reasonable prosecutor should have known the limits of the prosecutorial function and the difference between the role of the prosecutor and the role of the judge. And any reasonable prosecutor should have known that the Constitution is always implicated when a person is deprived of his/her liberty by a state sponsored seizure and subsequent detention.

. In her brief, Smith contends that this statement suggests that the judge placed the onus on Schneyder to notify him about delays in the case. The argument is disingenuous. Judge Means stated in his subsequent affidavit that he "explicitly placed the onus on Ms. Smith to notify [him] if for any reason the Overby case was continued or broke down.” (App.215). Moreover, to the extent that the Commonwealth argues that the judge intended for Schneyder to contact him, this is an issue of fact that must be resolved against the Commonwealth at this stage of the proceedings. See Decay v. Three Un-Named Police Officers, 746 F.2d 185 (3rd Cir.1984).

. As the majority notes, we previously rejected Smith’s claim of absolute immunity. In Odd v. Malone, 538 F.3d 202, 206 (3d Cir.2008), we considered Smith's appeal along with a similar appeal involving an A.D.A. who refused to inform the authorizing court that the proceeding in which a material witness was to testify had been continued. We noted that the judge in the companion case was ”[f]urious,” upon learning she had not been informed, and the judge released the witness and "demanded that [the A.D.A.] appear before her to explain why the plaintiff had been forced to remain in jail.”
Judge Means' reaction here was similar. Judge Means and his staff were "shocked” and "astonished” when they learned that Schneyder was still incarcerated, and the judge repeatedly apologized to Schneyder. *337 He told her: "again I apologize from the bottom of my heart for what happened to you.” (App.7).

. See Odd, 538 F.3d at 214 ("In short, it is a judicial function — the function of the courts— not' a prosecutorial function, to determine whom to incarcerate and for what length of time.”).