**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2340
_____

LARRY TRENT ROBERTS

v.

DAVID LAU, Detective; JOHN C. BAER, Assistant District
Attorney; CITY OF HARRISBURG

John C. Baer,
Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 1:21-cv-01140)
District Judge:  Honorable Jennifer P. Wilson

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
May 17, 2023

Before:  SHWARTZ, MONTGOMERY-REEVES, and
ROTH, *Circuit Judges*.

(Opinion filed: January 11, 2024)

Kimberly A. Boyer-Cohen
Marshall Dennehey Warner Coleman & Goggin
2000 Market Street, Suite 2300
Philadelphia, PA 19103
        *Counsel for Appellant*

John J. Coyle
Mark V. Maguire
McEldrew Purtell
123 S Broad Street, Suite 2250
Philadelphia, PA 19109
        *Counsel for Appellee*

———————————

OPINION OF THE COURT

———————————

MONTGOMERY-REEVES, *Circuit Judge*.

Larry Trent Roberts spent 13 years in prison for a murder that he did not commit. After being exonerated, Roberts sued several state actors involved in obtaining his wrongful conviction, including Assistant District Attorney John C. Baer.

According to the complaint, a hole developed in the prosecution's already weak case after a detective tried and failed to fabricate evidence of a conflict between Roberts and the victim. In response, the Assistant District Attorney took matters into his own hands by joining the police investigation and looking for a new witness to establish a motive for the

2

killing. That search led Baer to Layton Potter, a known jailhouse snitch who had been convicted for making false reports to law enforcement in the past. Baer approached Potter and got him to concoct a story that Roberts had a dispute with the victim over unpaid drug debts. Potter repeated that story at trial, and his false testimony was integral to Roberts's conviction.

Baer moved to dismiss the claims against him, arguing that he was absolutely immune from liability under 42 U.S.C. § 1983 because his alleged conduct, locating a new jailhouse snitch, occurred post-charge and was designed to produce inculpatory evidence for trial. The District Court denied the motion, explaining that the doctrine of absolute immunity for prosecutors did not apply because Baer's search for a new witness served an investigatory function. Baer appealed.

We agree with the District Court. When deciding whether absolute immunity applies, "we examine 'the nature of the function performed, not the identity of the actor who performed it.'" *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997) (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). Thus, prosecutors are not entitled to absolute immunity when they "perform[] the investigative functions normally performed by a detective or police officer." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Taking the complaint's well-pleaded factual allegations as true, which we must do at the motion-to-dismiss stage, Baer engaged in quintessential "police investigative work" when he affirmatively searched for and approached a new witness to establish motive. *Id.* at 274 n.5. Discovery may reveal that these allegations are false and that Baer's role was limited to interviewing a witness in preparation for trial. If so, he may yet be entitled to absolute immunity.

3

But those are not things that we can say at this early stage of the proceedings when we must accept the well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of Roberts. Thus, we will affirm because Baer has failed to show that he is entitled to absolute immunity on the face of the complaint.

## I. BACKGROUND

Because Baer challenges the District Court's denial of his motion to dismiss, we take the facts from the complaint.

### A. Duwan Stern Is Murdered

In December 2005, someone shot and killed Duwan Stern while he was sitting in his car. There were no eyewitnesses to the murder, but two neighborhood residents saw the aftermath. The residents saw two male figures lean into the car from the passenger door. One of the figures was Thomas Mullen, who admitted to pushing Stern's body onto the street and rummaging through the car for money or drugs. The other figure has not been identified.

About an hour after the shooting, David Lau, a detective with the Harrisburg Police Department, arrived at the scene. While Lau was at the scene, Stern's cellphone received three calls from the same phone number in a matter of minutes. The caller was Roberts, who was seeking to refute a rumor that Stern had been killed. Lau recognized Roberts's name or phone number because they had a history. In 1994, Lau struck Roberts with a firearm while arresting him. Roberts went to the hospital after the arrest. To justify his actions, Lau charged Roberts with assault. A court dismissed the charge. Nonetheless, this interaction led Lau to believe—without

4

cause—that Roberts was capable of murder. So Lau decided to include Roberts's picture in photo arrays in this case even though he was approximately 100 pounds heavier and 20 years older than the unidentified male figure that the witnesses described.

Lau showed the photo arrays to both residents and Mullen. None identified Roberts. To the contrary, one of the residents selected someone other than Roberts, and the other resident "favor[ed]" someone other than Roberts but stopped short of making a positive identification. App. 44.

### B. Lau and Baer Fabricate Evidence

Although police found no evidence inculpating Roberts, Lau zeroed in on him as the prime suspect. To that end, Lau took Roberts into custody under the pretense that he was addressing a separate matter and then persuaded Roberts to participate in a flawed, coercive, and unreliable suspect lineup for one of the neighborhood residents. The resident—who was influenced by the defective lineup Lau orchestrated—identified Roberts as the unknown male figure that she saw near Stern's car on the night of the murder. Lau used the resident's contaminated identification to support an affidavit of probable cause to arrest Roberts for the false charge of murdering Stern.

After arresting Roberts for a murder that he did not commit, Lau decided to shore up the state's case by fabricating evidence. Lau's first stop was Mullen, who was near the scene at the time of the shooting and gave self-serving statements that did not inculpate Roberts. Lau encouraged Mullen to provide

5

a false statement that Roberts confessed to the murder, and Mullen obliged.

Next, Lau approached an associate of Roberts to manufacture a motive for Stern's murder. Lau claimed that Roberts and Stern had a conflict related to the sale of a car and attempted to coerce the associate to provide false testimony supporting that narrative. The associate refused to cooperate, and Lau abandoned the "car-conflict" motive.

After the car-conflict motive fell through, Lau turned to Baer for help devising a new motive. Baer was an assistant district attorney assigned to prosecute the case. The complaint alleges that "Baer joined . . . Lau's investigation and began affirmatively seeking a jailhouse snitch who would testify as to a motive." App. 52. In other words, the complaint alleges that Baer's actions were not taken in response to leads already identified by Lau, but rather, that he was a joint actor with Lau in locating additional evidence.

For instance, the complaint alleges that "[i]n October 2007, nearly [two] years after the murder . . . and just one month before trial, . . . Baer and . . . Lau's investigation led them to Layton Potter, a known jailhouse snitch." *Id.* Baer knew that Potter lacked any credibility because he had been convicted of making false reports to law enforcement and regularly used crack cocaine. But Baer "approached" Potter anyway and "asked him if he 'wanted a piece' of the case against . . . Roberts." *Id.* Potter wanted a piece "to gain favor related to hi[s] own pending criminal charges" and "fabricated a story . . . out of whole cloth . . . that . . . Roberts and . . . Stern

6

were both in the drug business and had a dispute over unpaid drug debts." App. 52–53.

The value of Potter's statement "was made clear at trial when . . . Baer told the jury . . . that . . . Potter would 'help them understand how and why' the killing occurred." App. 53. All of Potter's testimony was false. But because of the unlawful actions by Lau, Baer, and the City of Harrisburg Police Department, Roberts was wrongfully convicted of murder and sentenced to life in prison without the possibility of parole.

## C. The District Court Denies Baer's Motion to Dismiss

In 2018, a Pennsylvania appellate court held that Roberts was entitled to a new trial. The state retried Roberts, and a jury acquitted him of all charges. Afterward, Roberts filed a complaint in the District Court alleging six claims related to his wrongful conviction. The complaint named as defendants Lau, Baer, and the City of Harrisburg ("City").

Relevant here were Counts II and IV, which brought claims against Baer under 42 U.S.C. § 1983 for fabricating and conspiring to fabricate evidence, in violation of the Fourth and Fourteenth Amendments. Both Counts focused on Baer's alleged search for a new witness. Count II alleged that Baer "fabricated evidence by way of [k]nowingly influencing, enticing, and coercing an inculpatory statement from Layton Potter: a jailhouse snitch, who lacked any credibility, whose statement could not be corroborated, and was only concerned with benefiting himself." App. 61.

Count IV alleged that "Lau and . . . Baer conspired to fabricate evidence for the purpose of convicting an actually

7

innocent man . . . ." App. 63. As overt acts, Count IV alleged that Lau and Baer "[k]nowingly sought out, influenced, enticed, and coerced an inculpatory statement from . . . Potter: a jailhouse snitch, who lacked any credibility, whose statement could not be corroborated, and was only concerned with benefiting himself." *Id.*

In September 2021, Baer moved to dismiss Counts II and IV, arguing that he was entitled to absolute immunity as a prosecutor for his alleged conduct obtaining Potter's false testimony. The District Court held that Baer's alleged conduct served an investigative function and denied his motion to dismiss. Baer appealed.[1]

## II.    DISCUSSION[2]

The sole issue on appeal is whether Baer functioned as an advocate or an investigator when he allegedly went looking

---

[1] While this appeal was pending, Roberts filed an amended complaint revising his allegations against the City. Because Roberts did not change his allegations against Baer, this appeal will "resolve [the] disputed question" of whether Baer is entitled to absolute immunity on the face of the operative complaint. *Cf. Saint-Jean v. Palisades Interstate Park Comm'n*, 49 F.4th 830, 835 (3d Cir. 2022).

[2] The District Court had subject-matter jurisdiction over Roberts's claims against Baer under 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291 because whether the District Court erred by denying Baer's motion to dismiss based on absolute immunity is a purely legal question appealable under the collateral order doctrine. *See, e.g., Fogle*

for a new witness to fabricate a motive for Roberts to kill Stern. If this alleged conduct served a prosecutorial function, Baer is absolutely immune from liability under § 1983. But if Baer's alleged search for a new witness went beyond his role as a quasi-judicial advocate and served an investigative function, absolute immunity does not attach because that defense only shields "actions [that are] intimately associated with the judicial phases of litigation." *Weimer v. County of Fayette*, 972 F.3d 177, 187 (3d Cir. 2020) (quoting *Odd v. Malone*, 538 F.3d 202, 208 (3d Cir. 2008)).

We conclude that Baer is not entitled to absolute immunity on the face of the complaint. This conclusion is based on our reading of two relevant cases from our Court: *Yarris*, 465 F.3d at 129, and *Fogle*, 957 F.3d at 148. These

---

*v. Sokol*, 957 F.3d 148, 155 (3d Cir. 2020) ("[W]e may review an 'interlocutory appeal of the District Court's order denying absolute . . . immunity . . . to the extent that the order turns on issues of law.'" (some alterations in original) (quoting *Yarris v. County of Delaware*, 465 F.3d 129, 134 (3d Cir. 2006)) (citing *Oliver v. Roquet*, 858 F.3d 180, 187–88 (3d Cir. 2017))).

"Review of a district court's order denying a motion to dismiss on absolute immunity grounds is plenary." *Fogle*, 957 F.3d at 156 (citing *Yarris*, 465 F.3d at 134). "[W]e apply the same standard as the District Court, accepting as true the factual allegations in the complaint and drawing all reasonable inferences in [the plaintiff's] favor . . . ." *Odd v. Malone*, 538 F.3d 202, 207 (3d Cir. 2008) (first citing *Yarris*, 465 F.3d at 134; and then citing *Giuffre v. Bissell*, 31 F.3d 1241, 1251 (3d Cir. 1994)).

9

cases compel the conclusion that Baer functioned as an investigator, not an advocate, when he identified and tracked down Potter and solicited Potter's false testimony as to motive in return for favorable treatment of the criminal charges pending against him. As we held in *Fogle*, "the 'key to the absolute immunity determination is not the timing of the investigation relative to a judicial proceeding, but rather the underlying function that the investigation serves and the role the [prosecutor] occupies in carrying it out.'" 957 F.3d at 163 (second alteration in original) (quoting *B.S. v. Somerset County*, 704 F.3d 250, 270 (3d Cir. 2013)). Baer engaged in "police investigative work" when he allegedly embarked on a post-charge search for a new witness to plug a hole in the prosecution's case. *See Buckley*, 509 U.S. at 274 n.5. Thus, Baer is not entitled to absolute immunity at the motion-to-dismiss stage because his alleged conduct served an investigative function.[3]

To explain our analysis, we begin by summarizing the doctrine of absolute immunity for prosecutors. We then

_____

[3] The dissent reads the complaint to allege that "[Lau] identified [Potter] as a potential witness." Dissent 4 n.3. The relevant paragraph from the complaint alleges, "It was only after it became clear to Detective Lau that Mr. Gibson [*i.e.*, the car-conflict witness] did not intend to cooperate in his scheme to present fabricated evidence that Detective Lau abandoned the 'car conflict' motive, that he began to conspire with ADA Baer to use Layton Potter to create a new motive." App. 52 ¶ 83. None of these words say that Lau identified Potter as a potential witness. Further, the next paragraph alleges that "[i]n order to fabricate evidence of motive, ADA Baer joined

10

Detective Lau's investigation and began affirmatively seeking a jailhouse snitch who would testify as to a motive." App. 52 ¶ 84. It is unclear whom Baer could have been "affirmatively seeking" if Lau had already identified Potter—*i.e.*, a "jailhouse snitch"—as a potential witness.

The dissent also states that the majority opinion "mix[es] the allegations against [Lau] and [Baer]" when it "suggests that [Baer] allegedly determined that the case was weak, initiated and conducted a search, and identified [Potter]." Dissent 4 n.3. Paragraph 84 of the complaint alleges that "[i]n order to fabricate evidence of motive, ADA Baer joined Detective Lau's investigation and began affirmatively seeking a jailhouse snitch who would testify as to a motive." App. 52. The next paragraph alleges, "In October 2007, nearly [two] years after the murder of Mr. Stern and just one month before trial, ADA Baer and Detective Lau's investigation led them to Layton Potter, a known jailhouse snitch." *Id.* ¶ 85. And paragraph 86 alleges, "ADA Baer approached Mr. Potter and asked him if he 'wanted a piece' of the case against Mr. Roberts." *Id.* Thus, we read the complaint to state, clearly, that Baer determined that the case was weak without evidence of motive and went looking—with Lau—for a new witness, whom *Baer* approached and persuaded to provide false testimony. And we would have to draw an inference against Roberts—the plaintiff and non-moving party—to conclude that Lau identified Potter as a potential witness. *Cf. Yarris*, 465 F.3d at 134 ("[I]n order to determine whether [a state actor is] entitled to absolute . . . immunity from any claims based on their alleged conduct," "[w]e must construe the facts in the manner most favorable to [the plaintiff].").

11

identify the particular conduct that Roberts challenges in his complaint and explain why Baer is not entitled to absolute immunity for allegedly engaging in that conduct under the appropriate framework.

### A. The Doctrine of Absolute Immunity for Prosecutors

Prosecutors like Baer are absolutely immune from liability under § 1983 for engaging in conduct that serves a quasi-judicial function. *See, e.g.*, *Kulwicki v. Dawson*, 969 F.2d 1454, 1463 (3d Cir. 1992) ("Absolute immunity attaches to all actions" that a prosecutor "perform[s] in a 'quasi-

At bottom, the question we must answer is whether Baer functioned as an investigator or an advocate when he went looking, post-charge, for a new witness to establish motive. We read controlling precedent to compel the conclusion that this alleged conduct served an investigative function. The dissent reads the same precedent to compel the opposite result. Perhaps that divergence suggests that this case presents a tough question with no clear answer. This does not mean, however, that we ought to tip the scales in favor of absolute immunity by drawing inferences against the plaintiff when evaluating a motion to dismiss. To the contrary, Baer has the burden to "show that the conduct triggering absolute immunity 'clearly appear[s] on the face of the complaint.'" *Fogle*, 957 F.3d at 161 (citing *Wilson v. Rackmill*, 878 F.2d 772, 776 (3d Cir. 1989)). Thus, to the extent that this case presents a difficult question, it should be unsurprising that the party who has the burden to show that they are clearly entitled to absolute immunity on the face of the complaint has failed to prevail on a motion to dismiss.

12

judicial' role." (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976))). To serve a quasi-judicial function, conduct must be "intimately associated with the judicial phase of the criminal process" or an analogous judicial proceeding. *See Imbler*, 424 U.S. at 430. Thus, absolute immunity does not shield "administrative or investigatory actions unrelated to initiating and conducting judicial proceedings." *Weimer*, 972 F.3d at 187 (quoting *Odd*, 538 F.3d at 208).

Our analysis of whether a prosecutor is entitled to absolute immunity "has two basic steps, though they tend to overlap." *Fogle*, 957 F.3d at 161 (quoting *Schneyder v. Smith*, 653 F.3d 313, 332 (3d Cir. 2011)). "First, we 'ascertain just what conduct forms the basis for the plaintiff's cause of action.' Then, we 'determine what function (prosecutorial, administrative, investigative, or something else entirely) that act served . . . .'" *Id.* (quoting *Schneyder*, 653 F.3d at 332). "To earn the protections of absolute immunity at the motion-to-dismiss stage, a [prosecutor] must show that the conduct triggering absolute immunity clearly appears on the face of the complaint." *Weimer*, 972 F.3d at 187 (cleaned up) (quoting *Fogle*, 957 F.3d at 161).

**B.      Whether Baer Is Entitled to Absolute Immunity**

The complaint alleges that "after it became clear" that an associate of Roberts's "did not intend to cooperate in [Lau's] scheme to present fabricated evidence" supporting the car-conflict motive, "Baer joined . . . Lau's investigation and began affirmatively seeking a jailhouse snitch who would testify as to a motive." App. 52. "[O]ne month before trial, . . . Baer and . . . Lau's investigation led them to . . . Potter, a known jailhouse snitch." *Id.* Baer knew that Potter lacked any

13

credibility because he had been convicted of making false reports to law enforcement in the past. But Baer "approached . . . Potter" anyway, *id.*; "asked [Potter] if he 'wanted a piece' of the case against . . . Roberts," *id.*; and "[k]nowingly . . . influenced, enticed, and coerced" Potter to provide false testimony establishing motive. App. 63.

Baer argues that his alleged conduct served a prosecutorial function because it "occurred only one month prior to trial and for the purpose of getting Potter to testify at trial." Opening Br. 22. For support, Baer primarily relies on this Court's opinion in *Yarris*, which held that prosecutors were entitled to absolute immunity for allegedly using "'stick and carrot' treatment to elicit . . . false testimony" from a jailhouse informant. 465 F.3d at 139.

Roberts responds that this alleged conduct served an investigative function because "Baer sought out, influenced, enticed, and coerced a jailhouse snitch into giving a statement for the purpose of formulating a motive." Response Br. 11. For support, Roberts primarily relies on this Court's opinion in *Fogle*, which held that prosecutors were not entitled to absolute immunity for "solicit[ing] false statements from jailhouse informants" and "deliberately encourag[ing] . . . State Troopers to do the same." 957 F.3d at 164.

While it is a close call, we conclude that Roberts has the better argument. The allegations that Baer went looking for a new witness to provide false testimony describe an investigator's work "seeking to generate evidence in support of a prosecution," not an advocate's work "interviewing witnesses as he prepare[s] for trial." *Fogle*, 957 F.3d at 163–64 (quoting *Buckley*, 509 U.S. at 273). As such, the District Court did not err by denying Baer's motion to dismiss because

his alleged conduct served an investigative function. We reach this conclusion for two reasons: (1) Baer relies on a bright-line rule inconsistent with the functional approach to absolute immunity; and (2) *Fogle* provides a closer match than *Yarris* to Baer's alleged conduct, and its reasoning dictates that Baer is not entitled to absolute immunity on the face of the complaint. We expound on both reasons below.

### 1. The fact-specific nature of absolute immunity

Baer argues that his alleged search for a new witness served a prosecutorial function because it occurred post-charge and was designed to produce inculpatory evidence for trial. Neither reason carries the day.

The first part of this equation cannot be enough. The Supreme Court has explained that "a determination of probable cause [for an arrest] does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination, . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Buckley*, 509 U.S. at 274 n.5. And while the fact that conduct occurred pre-charge might establish that it did not serve a prosecutorial function, *id.* at 274 ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."), the inverse is not true. Detectives can continue to investigate a crime and generate evidence after charges have been filed. Thus, the fact that a prosecutor sought to generate evidence post-charge

15

cannot be enough to show that their conduct served a prosecutorial function.

The second part fares no better. Prosecutors who seek to generate evidence post-charge almost always can describe their conduct as an effort to produce inculpatory evidence for trial. So, absent unusual circumstances, holding that a prosecutor's effort to generate evidence for an ongoing judicial proceeding always serves a quasi-judicial function is really just a bright-line rule based on timing. And while the absence of a link to a judicial proceeding might establish that conduct did not serve a prosecutorial function, *Giuffre*, 31 F.3d at 1254 ("[A]ctions [that] 'have no functional tie to the judicial process' . . . are not entitled to absolute immunity merely because they were actions undertaken by a prosecutor." (quoting *Buckley*, 509 U.S. at 277)), the inverse is not true. Detectives generate inculpatory evidence for trial. But they are not quasi-judicial advocates entitled to absolute immunity. Thus, the fact that a prosecutor generated evidence for an ongoing judicial proceeding cannot per se be enough to show that their conduct served a prosecutorial function.[4]

This leaves the possibility that a combination of post-charge timing and link to an ongoing judicial proceeding,

---

[4] Baer argues that this Court's opinion in *Rose v. Bartle*, 871 F.2d 331 (3d Cir. 1989), supports a bright-line rule that "soliciting perjured testimony in preparation of and for use in judicial proceedings is protected by absolute immunity." Reply Br. 5. *Rose* predates *Buckley* and thus did not have the benefit of the Supreme Court's guidance that tying evidence to a judicial proceeding is not enough to show that its fabrication served a prosecutorial function. 509 U.S. at 276; *see also*

16

without more, is enough to show that a prosecutor's generation of evidence served a prosecutorial function. But that bright-line rule cannot be the answer either, as *Fogle* and *Yarris* both dealt with post-charge efforts by prosecutors to fabricate evidence for trial. *See Yarris*, 465 F.3d at 139 ("As the Amended Complaint makes clear, Yarris had already been charged . . . before [a jailhouse informant] made any statements about what Yarris told him while they were held in adjacent prison cells." (citation omitted)); *Fogle*, 957 F.3d at 163–64 (rejecting the argument that "absolute immunity protect[ed]" prosecutors' search for new jailhouse informants because it "occurred after the initiation of criminal charges"

---

*Karns v. Shanahan*, 879 F.3d 504, 514 (3d Cir. 2018) ("[A] panel may revisit a prior holding of the Court 'which conflicts with intervening Supreme Court precedent.'" (quoting *In re Krebs*, 527 F.3d 82, 84 (3d Cir. 2008)) (citing *Council of Alt. Pol. Parties v. Hooks*, 179 F.3d 64, 69 (3d Cir. 1999))).

In any event, *Rose* is distinguishable because that plaintiff provided "no elaboration in the pleadings regarding the circumstances in which the alleged solicitations of perjury took place," except that a prosecutor "asked[] or coerced [a witness] to testify perjuriously before the grand jury." 871 F.2d at 344 (citations omitted). Roberts provided detailed allegations describing the actions that Baer took to affirmatively search for a new jailhouse informant and coerce him to provide false testimony. *See infra* Section II.B.2. Thus, his complaint does not lack "elaboration . . . regarding the circumstances in which the alleged solicitations of perjury took place." *Rose*, 871 F.2d at 344.

17

(citation omitted)).[5] Moreover, our case law has cautioned that determining whether a prosecutor is entitled to absolute immunity requires a fact-intensive inquiry that generally cannot be reduced to bright-line rules.[6] And this would be a

[5] The dissent argues that "this case is more like *Yarris* than *Fogle* . . . [because] the complaint clearly states that [Baer] solicited the witness's statement for the purpose of gathering testimony, and the temporal proximity to the trial shows this testimony was intended to be used for trial rather than for an investigative purpose." Dissent 10–11. But the complaint from *Fogle* also alleged that prosecutors solicited false testimony post-charge to shore up the state's case at trial. *See, e.g.*, 957 F.3d at 154 ("The case quickly began to unravel as the defendants discovered [a witness's] wandering and inconsistent theories had largely powered the criminal complaints. Timely support soon arrived from jailhouse informants recruited and counseled by the State Troopers."); *id.* at 164 ("Prosecutors not only solicited false statements from jailhouse informants, but deliberately encouraged the State Troopers to do the same '[k]nowing their evidence was weak' . . . ." (first alteration in original)). So neither the timing of alleged conduct as post-charge nor a connection to trial distinguishes *Yarris* from *Fogle*.

[6] *See, e.g.*, *Odd*, 538 F.3d at 210 ("We have rejected bright-line rules that would treat the timing of the prosecutor's action (*e.g.* pre- or post[-]indictment), or its location (*i.e.* in- or out-of-court), as dispositive." (first citing *Rose*, 871 F.2d at 346; and then citing *Kulwicki*, 969 F.2d at 1463)); *Fogle*, 957 F.3d at 164 ("Our role is not to look at the 'timing of the prosecutor's action (*e.g.* pre- or post-indictment),' but at the function being performed." (quoting *Odd*, 538 F.3d at 210)).

two-part inquiry in name only, as the connection-to-a-judicial-proceeding prong would collapse into the post-charge-timing prong in nearly all cases for the reasons provided above.

Accordingly, this line of argument leads us back to where we started. "Following the Supreme Court's guidance, our prosecutorial immunity analysis focuses on the unique facts of each case and requires careful dissection of the prosecutor's actions." *Odd*, 538 F.3d at 210 (first citing *Yarris*, 465 F.3d at 136; and then citing *Kulwicki*, 969 F.2d at 1463). The timing of conduct as pre- or post-indictment and the presence or absence of a connection to a judicial proceeding are "relevant" "considerations . . . to the extent that they bear upon the nature of the function the prosecutor is performing." *Id.* (first citing *Yarris*, 465 F.3d at 138–39; and then citing *Kulwicki*, 969 F.2d at 1467). But they are not enough to establish that a prosecutor's post-charge effort to fabricate evidence for trial served a quasi-judicial function, alone or combined. And the ultimate question is whether Baer has established—on the face of the complaint—that he "was functioning as the state's 'advocate'" when he affirmatively sought a new witness and coerced him to provide false testimony. *Yarris*, 465 F.3d at 136 (citing *Buckley*, 509 U.S. at 274).

Having dispensed with bright-line rules, we turn to the nuanced inquiry of whether *Fogle* or *Yarris* provides a closer

19

fit to Baer's alleged conduct and assess whether he is entitled to absolute immunity under the proper comparator.

## 2. Applying precedent to Baer's alleged fabrication

As we noted above, we recognize that this is a close call. Ultimately, we conclude that the allegations and reasoning from *Fogle* dictate the conclusion that Baer is not entitled to absolute immunity on the face of the complaint for three reasons.

First, Baer's alleged conduct, identifying Potter to solicit false testimony, is nearly identical to the prosecutors' alleged conduct in *Fogle*, recruiting jailhouse informants. In both cases, a hole developed in the prosecution's case post-charge after a witness refused to testify or lost credibility. *Compare Fogle*, 957 F.3d at 154 ("The case quickly began to unravel as the defendants discovered [a witness's] wandering and inconsistent theories had largely powered the criminal complaints."), *with* App. 52 (alleging that Lau "began to conspire with . . . Baer to use . . . Potter to create a new motive" after the car-conflict motive fell through). And in both cases, "[t]imely support soon arrived" from new "jailhouse informants," whom prosecutors "recruited" to provide false testimony "[k]nowing their evidence was weak." *Compare Fogle*, 957 F.3d at 154, 164, *with* App. 52–53 (alleging that Baer found Potter "just one month before trial" and persuaded him to provide false testimony implicating Roberts). Finally, both complaints alleged that prosecutors collaborated with police officers to find new witnesses willing to provide false testimony. *Compare Fogle*, 957 F.3d at 164 ("Fogle alleges that the Prosecutors not only solicited false statements from jailhouse informants, but deliberately encouraged the State

Troopers to do the same . . . ."), *with* App. 52 (alleging that "Baer joined . . . Lau's investigation and began affirmatively seeking a jailhouse snitch who would testify as to a motive"). Given these similarities, we agree with the District Court that Baer's alleged search for a new witness involved conduct that *Fogle* "plainly stated . . . 'do[es] not enjoy absolute immunity.'" *Roberts v. Lau*, No. 1:21-CV-01140, 2022 WL 2677473, at *3 (M.D. Pa. July 11, 2022) (quoting *Fogle*, 957 F.3d at 162).[7]   This is an investigatory function and distinguishable, for instance, from a similar but different situation where a prosecutor might interview and meet a previously unknown witness who has been located and identified by investigators.

Second, like the plaintiff in *Fogle*, Roberts provided detailed allegations describing the actions that Baer took to find a new jailhouse informant and coerce him to provide false testimony. *See, e.g.*, *Fogle*, 957 F.3d at 164 ("Fogle alleges that the Prosecutors not only solicited false statements from jailhouse informants, but deliberately encouraged the State Troopers to do the same knowing their evidence was weak . . . ." (cleaned up)).   Contrastingly, the plaintiff in *Yarris* vaguely alleged that prosecutors used "stick and carrot treatment to elicit . . . false testimony" and "did not describe in detail when or how the prosecutors obtained a false statement

---

[7] Our dissenting colleague argues that "a prosecutor's choice to offer motive evidence and to speak with a witness about the topic, as [Baer] did here, constitutes an advocacy function." Dissent 7 n.6.  We agree.  But that does not change our analysis because it was Baer's alleged search for a new witness that served an investigative function, not Baer's decision to speak with the witness and present his false testimony at trial.

21

from a jailhouse informant." 465 F.3d at 139 (cleaned up). The more detailed allegations present here and in *Fogle* provide more support to conclude, at the motion-to-dismiss stage, that the prosecutors functioned as investigators by searching for a new witness to provide false testimony. This level of detail also helps to reduce the risk of vexatious litigation, as it is more difficult for a plaintiff with a frivolous claim to provide in a complaint detailed allegations of prosecutorial misconduct than vague ones. *See generally Van de Kamp v. Goldstein*, 555 U.S. 335, 341 (2009) (explaining that one reason why the Supreme Court extended absolute immunity to prosecutors was "the general common-law concern that harassment by unfounded litigation could both cause a deflection of the prosecutor's energies from his public duties and also lead the prosecutor to shade his decisions instead of exercising the independence of judgment required by his public trust." (cleaned up) (quoting *Imbler*, 424 U.S. at 423)).[8]

Third and finally, Baer places too much weight on the allegation from *Fogle* that prosecutors participated in "a long

---

[8] The dissent argues that "*Fogle*'s reasoning that 'generating evidence' to support a prosecution constitutes an investigative function conflicts with our earlier cases holding that collecting evidence in preparation for trial or grand jury proceedings is an advocacy function." Dissent 9 (first citing *Yarris*, 465 F.3d at 139; then citing *Rose*, 871 F.2d at 244; and then citing *Buckley*, 509 U.S. at 273). We disagree as this seems to bring us back to a bright-line rule. Holding that a prosecutor's effort to fabricate evidence for a judicial proceeding always serves a quasi-judicial function would grant prosecutors carte blanche

22

to investigate their theory of the case post-charge. *See supra* Section II.B.1. That result cannot be squared with the Supreme Court's direction in *Buckley* that, "[o]f course, a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination . . ., a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." 509 U.S. at 274 n.5. Considering that *Yarris* cited *Buckley* with approval, 465 F.3d at 135–36, we are reluctant to adopt an interpretation of this Court's holding that conflicts with the Supreme Court's direction, especially when doing so means endorsing a bright-line rule that would undermine the functional approach to absolute immunity, *see id.* at 136 ("As the Supreme Court explained in *Kalina* . . ., 'in determining immunity, we examine the nature of the function performed, not the identity of the actor who performed it.'" (quoting 522 U.S. at 127)).

The dissent also argues that "[a] review of [*Yarris* and *Fogle*] reveals that *the crux* of the allegations regarding the solicitation of false testimony was nearly identical." Dissent 10 n.8 (emphasis added). Maybe so. But the functional approach to absolute immunity requires that courts carefully parse the allegations a plaintiff makes in their complaint. And only the complaint from *Fogle* described what prosecutors did to find a new witness able to provide false testimony. *Compare Fogle*, 957 F.3d at 164 ("Fogle alleges that the Prosecutors not only solicited false statements from jailhouse informants, but deliberately encouraged the State Troopers to do the same '[k]nowing their evidence was weak' . . . ." (first alteration in original)), *with Yarris*, 465 F.3d at 139 ("Yarris . . . claims that

23

chain of investigative events" stretching back before there was probable cause to bring charges. *See* 957 F.3d at 163. This Court groups related conduct together when identifying its function. Consistent with that approach, *Fogle* analyzed prosecutors' alleged efforts to solicit false statements from new jailhouse informants separately from the other conduct in that long chain of investigative events. *See* 957 F.3d at 161–64; *see also Yarris*, 465 F.3d 136–39 (analyzing prosecutor's alleged effort to obtain a false statement from a jailhouse informant separately from other types of challenged conduct). True, *Fogle* referred to other conduct in that chain of events while discussing whether prosecutors were entitled to absolute immunity for soliciting false testimony from jailhouse informants. 957 F.3d at 164. But it did so to explain how prosecutors knew that the state's case was weakened and would benefit from fabricated evidence. *Id.* Identifying a motive to fabricate does not change the Court's conclusion that the fabrication served an investigative function because prosecutors sought "to generate evidence in support of a

---

the [prosecutors] used a 'stick and carrot' treatment to elicit . . . false testimony, . . . although he . . . does not describe in detail when or how the [prosecutors] obtained a false statement from a jailhouse informant." (cleaned up)). Thus, *Fogle* is consistent with *Yarris*. And we see no reason to read *Yarris* as standing for the overbroad proposition that prosecutors always are entitled to absolute immunity when they seek to generate evidence for an ongoing judicial proceeding.

prosecution." *Id.* And neither does the fact that prosecutors engaged in *other* conduct before bringing charges.[9]

For the reasons provided above, *Fogle* provides a closer fit to Baer's alleged conduct than *Yarris*. And its reasoning compels the result that Baer is not entitled to absolute immunity on the face of the complaint. Baer "played 'the detective's role' to 'search[] for . . . clues and corroboration'" when he went looking for a new jailhouse informant, found Potter, approached Potter, and knowingly influenced, enticed, and coerced Potter to provide false testimony. 957 F.3d at 162 (alteration in original) (quoting *Buckley*, 509 U.S. at 273). "[W]hen the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same." *Id.* at 164 (quoting *Buckley*, 509 U.S. at 276). Thus,

---

[9] Baer notes that *Fogle* "held that absolute immunity did apply with regard to . . . [prosecutors'] alleged conduct . . . using [another witness's] false statement in the probable cause affidavit presented to the magistrate judge and failing to report [the witness's] past inconsistent statements." Opening Br. 29 (citing *Fogle*, 957 F.3d at 162). That distinction makes no difference because using false evidence in an affidavit—or failing to disclose exculpatory evidence—does not involve generating evidence. And like in *Fogle*, it is Baer's alleged effort to generate new evidence by searching for a new jailhouse informant that served an investigative function. *See* 957 F.3d at 164 ("[T]he Prosecutors were functioning not as advocates, but as investigators seeking to generate evidence in support of a prosecution.").

Baer is not entitled to absolute immunity because his alleged conduct served an investigative function.[10] [11]

---

[10] Baer cites a handful of unpublished and out-of-circuit cases to support his arguments. *See Annappareddy v. Pascale*, 996 F.3d 120 (4th Cir. 2021); *Cousin v. Small*, 325 F.3d 627 (5th Cir. 2003); *Neptune v. Carey*, 2021 WL 5632077 (3d Cir. Dec. 1, 2021) (not precedential); *Jacobs v. City of Philadelphia*, 2022 WL 1772989 (3d Cir. June 1, 2022) (not precedential); *Kroemer v. Tantillo*, 758 Fed. App'x 84 (2d Cir. 2018) (summary order). Because this Court's precedential opinion in *Fogle* resolves whether Baer is entitled to absolute immunity on the face of the complaint, we need not address this non-binding authority. *See generally United States v. Maury*, 695 F.3d 227, 259 n.27 (3d Cir. 2012) ("Of course, the decisions of other circuits, while persuasive, are not binding on the district courts in this Circuit."); 3d Cir. I.O.P 5.7 ("The court by tradition does not cite to its not precedential opinions as authority. Such opinions are not regarded as precedents that bind the court . . . ."); 2d Cir. L.R. 32.1.1(a) ("Rulings by summary order do not have precedential effect.").

[11] The dissent argues that denying Baer's motion to dismiss "means that every time a prosecutor prepares for trial and determines that an additional piece of evidence is needed to prove the crime beyond a reasonable doubt, he is acting in an investigative role." Dissent 8. Not so. The complaint alleges that Baer went looking for a new witness to establish motive. Holding that this alleged conduct served an investigatory function does not mean that prosecutors who identify a hole in the state's case ahead of trial—but do not attempt to fill that hole by affirmatively searching for a new witness—will lose

26

\*     \*     \*     \*     \*

To prevail, Baer "must show that the conduct triggering absolute immunity clearly appears on the face of the complaint." *Weimer*, 972 F.3d at 187 (cleaned up) (quoting *Fogle*, 957 F.3d at 161). "[T]hat burden is uniquely heavy" at the motion-to-dismiss stage "because . . . 'it is the [prosecutor's] conduct *as alleged in the complaint* that is scrutinized." *Fogle*, 957 F.3d at 160 (emphasis in original) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)) (citing *Odd*, 538 F.3d at 207).

Baer has failed to carry that burden for the reasons provided above. This does not mean, however, that Baer is precluded from asserting an absolute immunity defense at later stages of this litigation. For example, Baer can test Roberts's allegations in discovery. As the record develops, Baer may be able to establish that his conduct served a quasi-judicial function. If so, he may yet be entitled to absolute immunity. *See generally Kalina*, 522 U.S. at 121 (assessing whether a prosecutor was entitled to absolute immunity at summary judgment). But that is a question for another day. And accepting as true all of the well-pleaded factual allegations that Roberts included in his complaint, as we must when considering a motion to dismiss, *see, e.g.*, *Odd*, 538 F.3d at 207, Baer is not entitled to absolute immunity because his alleged search for a new witness served an investigative

---

the protection of absolute immunity. And we fail to see how a prosecutor's alleged search for a new witness constitutes an "out-of-court 'effort to control the presentation of [a] witness'[s] testimony.'" *Buckley*, 509 U.S. at 272–73 (alteration in original) (quoting *Imbler*, 424 U.S. at 430 n.32).

27

function. Thus, the District Court did not err by denying Baer's motion to dismiss.

## III. CONCLUSION

For the reasons discussed above, we will affirm the District Court's order denying Baer's motion to dismiss.

SHWARTZ, J., dissenting

My colleagues have concluded that the Assistant District Attorney's ("ADA") interview of a potential trial witness constituted an investigative act that is not shielded by absolute prosecutorial immunity. Because the ADA was acting as an advocate rather than an investigator when he allegedly solicited false testimony one month before trial, I would reverse the District Court's order denying him absolute immunity and direct that the Court dismiss the complaint against him.

A prosecutor is absolutely "immune from a civil suit for damages" for "activities [] intimately associated with the judicial phase of the criminal process." Imbler v. Pachtman, 424 U.S. 409, 430-31 (1976). To determine whether an activity is associated with the judicial phase, we "focus upon the functional nature of the activities rather than [the prosecutor's] status." Fogle v. Sokol, 957 F.3d 148, 159 (3d Cir. 2020) (quotations omitted). This functional test "separates advocacy from everything else." Id. at 159-60 (citations omitted). Protected tasks include "initiating a prosecution and [] presenting the State's case," Imbler, 424 U.S. at 431, interviewing witnesses and soliciting testimony in preparation for grand jury proceedings, Rose v. Bartle, 871 F.2d 331, 344-45 (3d Cir. 1989), obtaining witness statements in connection with a prosecution, Yarris v. County of Delaware, 465 F.3d

129, 139 (3d Cir. 2006), and presenting evidence to a judge, Burns v. Reed, 500 U.S. 478, 479, 491-92 (1991).[1]

Conversely, "absolute immunity does not extend to '[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings.'" Yarris, 465 F.3d at 135 (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993)). Thus, we must distinguish "the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." Buckley, 509 U.S. at 273. We have generally held that a prosecutor's conduct "[b]efore probable cause for an arrest . . . [i]s entirely investigative in character," but noted that even after a determination of probable case, "a prosecutor may engage in police investigative work that is entitled to only qualified immunity." Fogle, 957 F.3d at 160 (quoting Buckley, 509 at 274 n.5).[2] Ultimately, determining the precise function

---

[1] The immunity is not limited to in-court conduct. Instead, "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom," since "an out-of-court effort to control the presentation of [a] witness' testimony . . . [is] fairly within [the prosecutor's] function as an advocate." Buckley v. Fitzsimmons, 509 U.S. 259, 272-73 (1993) (quotations and citation omitted).

[2] As an example of such investigative work, Buckley noted that "if a prosecutor plans and executes a raid on a suspected weapons cache," he is not entitled to absolute prosecutorial immunity. 509 U.S. at 274.

of a prosecutor's action is "fact-specific," and we have cautioned against creating bright-line rules or applying "categorical reasoning" to this analysis. Id.; see also Odd v. Malone, 538 F.3d 202, 210 (3d Cir. 2008) (rejecting "bright-line rules that would treat the timing of the prosecutor's action (e.g. pre-or post[-]indictment), or its location (i.e. in-or out-of-court), as dispositive").

Here, Roberts alleges that "after it became clear to Detective Lau" that Robert's associate "did not intend to cooperate in his scheme . . . [Lau] began to conspire with [the] ADA [] to use Layton Potter to create a new motive." App. 52 (Compl. ¶ 83).[3] Roberts continues that one month before trial,

---

[3] The primary difference between the dissent and majority is our view of the complaint. The majority characterizes the allegations as saying that the ADA looked for and identified the witness, and concludes, as a result, that the ADA performed an investigatory function. See Majority Op. at 10 ("[The ADA] functioned as an investigator, not an advocate, when he identified and tracked down Potter and solicited Potter's false testimony."); Majority Op. at 14 ("The allegations that [the ADA] went looking for a new witness . . . describe an investigator's work seeking to generate evidence in support of a prosecution, not an advocate's work interviewing witnesses as he prepares for trial." (internal quotation marks and citations omitted)); Majority Op. at 25 ("[The ADA] played the detective's role . . . when he went looking for a new jailhouse informant [and] found Potter[.]" (quotations omitted)).

The majority emphasizes that a different conclusion would be warranted if the ADA had interviewed a witness who

Lau had identified.  <u>See</u> Majority Op. at 6 ("The complaint alleges that [the ADA's] actions were not taken in response to leads already identified by Lau, but rather, that he was a joint actor with Lau in locating additional evidence."); Majority Op. at 21 ("This is an investigatory function and distinguishable, for instance, from a similar but different situation where a prosecutor might interview and meet a previously unknown witness who has been located and identified by investigators.").  As indicated above, that is precisely what the complaint alleges: that the Detective identified the individual as a potential witness. **App. 52 (Compl. ¶ 83).**  Although the majority relies on the allegation that the ADA "joined [] [the Detective's] investigation and began affirmatively seeking a jailhouse snitch who would testify as to a motive," Majority Op. at 21 (citing App. 52 (Compl. ¶ 84)), this does not account for the fact  that this allegedly happened only after Lau identified the individual as a witness.  <u>See</u> **App. 52 (Compl. ¶ 83).**  Thus, the Majority and I have different views about this critical reference to the witness.

Likewise, by mixing the allegations against the Detective and the ADA, the majority incorrectly suggests that the ADA allegedly determined that the case was weak, initiated and conducted a search, and identified the witness.  <u>Compare</u> Majority Op. at 13 (quoting App. 52 ¶¶ 83–84) ("[A]fter it became clear" that Robert's associate "did not intend to cooperate in [the Detectives] scheme to present fabricated evidence" supporting the car-conflict motive, the ADA "joined . . . [the Detective's] investigation and began affirmatively seeking a jailhouse snitch who would testify as to a motive."); <u>with</u> App. 52 ¶¶ 83–84 ("It was only after it became clear to [] [the Detective] that [an associate of Roberts] did not intend to

the ADA "joined Detective Lau's investigation and began affirmatively seeking a jailhouse snitch who would testify as to a motive." App. 52 (Compl. ¶¶ 84-85). The ADA then allegedly met with and solicited a false statement from the witness, **App. 52 (Compl. ¶ 87),** and relied on the witness's testimony at trial**, App. 53 (Compl. ¶¶ 89, 91)**. These allegations are nearly identical to the allegations in Yarris, where the complaint alleged that prosecutors "obtain[ed] a false statement from a jailhouse informant" after Yarris had been charged, "used a 'stick and carrot' treatment to elicit [the informant's] testimony," and that the informant then provided false testimony at trial. 465 F.3d at 139. We concluded that the Yarris prosecutors were "acting as advocates rather than investigators" when they solicited the false statements because their "involvement with [the informant's] statements occurred after [the] prosecution for those crimes had begun." Id. (emphasis omitted); see also Rose, 871 F.2d at 344-45 (holding that prosecutors' solicitation and preparation of perjured testimony was entitled to immunity because these actions

---

cooperate in his scheme to present fabricated evidence that [] [the Detective] abandoned the 'car conflict' motive, that he began to conspire with [the] ADA [] to use [the witness] to create a new motive. . . . [The ADA] joined [the Detective's] investigation and began affirmatively seeking a jailhouse snitch who would testify as to a motive."); cf. Majority Op. at 2-3 (stating that the ADA "took matters into his own hands by joining the police investigation and looking for a new witness," which "led [the ADA] to [] [the witness]."). By doing so, the majority incorrectly attributes the Detective's actions to the ADA.

"occurred in preparation for the grand jury proceedings, not in an investigatory capacity").[45]

The ADA's solicitation of the witness's testimony is likewise entitled to absolute immunity because the ADA was

---

[4] The majority suggests that the reasoning in Rose did not survive Buckley's "guidance that tying evidence to a judicial proceeding is not enough to show that its fabrication served a prosecutorial function." Majority Op. at 16 n.4. This statement overreads Buckley, which addressed a situation in which prosecutors sought to match a bootprint found at the scene of the crime "before they had probable cause to arrest petitioner or to initiate judicial proceedings," and well before a grand jury was empaneled. 509 U.S. at 274-75. Buckley cautioned that a prosecutor could not convert such acts into prosecutorial work simply because "after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial." Id. at 276. This guidance is thus inapplicable to Rose, where the alleged "solicitation and preparation of perjured testimony" was "for use in the grand jury proceedings," 871 F.2d at 344, and thus was actually tied to the judicial proceedings.

[5] See also Annappareddy v. Pascale, 996 F.3d 120, 140 (4th Cir. 2021) (holding that a prosecutor's fabrication of evidence was not "post-indictment police investigative work," but rather was undertaken in an "advocative" capacity to prepare for trial because (1) the conduct "occurred only after [the plaintiff] had been identified as a suspect, after probable cause had been established, and after he had been twice indicted," id., and (2) the complaint alleged that the prosecutor began to take a "more hands-on approach in anticipation of

Page **6** of **11**

acting as an advocate in preparation for trial. The alleged solicitation occurred over a year and a half after Roberts had been identified as a suspect and charged, and then only after the Detective identified the witness to the ADA one month before trial. **App. 44, 52 (Compl. ¶¶ 48, 83, 85).** While timing is not dispositive, Fogle, 957 F.3d at 160, the complaint also specifically alleges that the ADA was seeking someone "who would testify as to a motive" for the murder.[6] App. 52 (Compl. ¶ 84). This statement demonstrates that the ADA was "evaluating evidence and interviewing witnesses as he prepare[d] for trial," rather than just "searching for [] clues." Buckley, 509 U.S. at 273. Accordingly, the timing of the

---

trial, once she realized that the existing [evidence] was not nearly as favorable to the government as she had expected," id. (internal quotation marks, citations, and emphasis omitted)).

[6] It is undisputed that the purpose of the witness's testimony was to show motive. Motive is not required to charge an individual with a crime, and it need not be proven to establish guilt, but it is often helpful to present motive evidence at trial to provide the jury with context. See Commonwealth v. Shain, 426 A.2d 589, 591 (Pa. 1981) (explaining that a prosecutor is not required to show motive, but that motive "may be relevant to prove the identity of the perpetrator and/or the degree of the offense," and that "[w]here the Commonwealth elects to prove motive . . . it must be established by legally competent evidence"). The prosecutor decides the evidence that is presented at trial, and thus a prosecutor's choice to offer motive evidence and to speak with a witness about the topic, as the ADA did here, constitutes an advocacy function.

conduct and its purpose show that the ADA acted as an advocate rather than an investigator when he met with Potter.[7]

To hold otherwise means that every time a prosecutor prepares for trial and determines that an additional piece of evidence is needed to prove the crime beyond a reasonable doubt, he is acting in an investigative role. Such a view essentially narrows the advocacy work protected by absolute immunity to actions in the courtroom even though the law clearly recognizes that prosecutors engage in the work of an advocate outside the courtroom too. See Buckley, 509 U.S. at 272-73 (confirming that actions "apart from the courtroom" can be entitled to immunity, such as an "out-of-court effort to control the presentation of [a] witness' testimony" (quotation marks and citation omitted)). The ADA here was preparing for trial and interviewed a witness, who the Detective identified,

---

[7] The majority asserts that this holding would create a bright-line rule based on timing, in violation of the Buckley. I do not suggest, however, that timing alone is dispositive. Instead, under Buckley, timing remains an important factor that may be considered in determining the nature of the function being performed. See Buckley, 509 U.S. at 273-74. Here, the act of soliciting witness testimony to prove motive at trial, along with the fact that the solicitation occurred one month before trial, demonstrate that the ADA's actions were performed as an advocate rather than an investigator. This conclusion is consistent with Buckley's functional approach. See id. at 273; see also Fogle, 957 F.3d at 159.

for presentation to the jury. This is clearly the work of an advocate.

My colleagues and the District Court rely on our ruling in <u>Fogle</u> to conclude that the ADA's actions were investigatory and not advocacy. <u>Roberts v. Lau</u>, No. 1:21-CV-01140, 2022 WL 2677473 at *2-3 (M.D. Pa. July 11, 2022). In <u>Fogle</u>, we denied absolute immunity to prosecutors who encouraged or permitted State Troopers "to fabricate statements from three jailhouse informants," even though such conduct occurred after the initiation of criminal charges. 957 F.3d at 163-64. In doing so, we explained that the <u>Fogle</u> prosecutors "not only solicited false statements from jailhouse informants, but deliberately encouraged the State Troopers to do the same knowing their evidence was weak." <u>Id.</u> at 164 (quotations omitted and cleaned up). Thus, we concluded that the "prosecutors were functioning not as advocates, but as investigators seeking to generate evidence in support of a prosecution." <u>Id.</u>

<u>Fogle</u>'s reasoning that "generating evidence" to support a prosecution constitutes an investigative function conflicts with our earlier cases holding that collecting evidence in preparation for trial or grand jury proceedings is an advocacy function. <u>See, e.g.</u>, <u>Yarris</u>, 465 F.3d at 139 (concluding solicitation of false statements was an advocacy function); <u>Rose</u>, 871 F.2d at 244 (holding that solicitation of testimony for use in grand jury proceedings "are encompassed within the preparations necessary to present a case and therefore are immunized" (quotations and citation omitted)); <u>see also</u> <u>Buckley</u>, 509 U.S. at 273 (describing "evaluating evidence and interviewing witnesses as he prepares for trial" as "the advocate's role"). Because <u>Yarris</u> and <u>Rose</u> were decided

before <u>Fogle</u>, they control our analysis. <u>See</u> <u>Pardini v. Allegheny Intermediate Unit</u>, 524 F.3d 419, 426 (3d Cir. 2008) (observing that if two precedential "cases conflict, the earlier is the controlling authority and the latter is ineffective as precedent[]." (quoting <u>United States v. Rivera</u>, 365 F.3d 213, 213 (3d Cir. 2004))). Applying those cases, the ADA should be entitled to absolute immunity for his procurement and presentation of the witness's testimony.[8]

Furthermore, even assuming <u>Fogle</u> can be reconciled with <u>Yarris</u>, this case is more like <u>Yarris</u> than <u>Fogle</u>, and thus immunity is warranted here. First, like the prosecutors in <u>Yarris</u>, the complaint clearly states that the ADA solicited the witness's statement for the purpose of gathering testimony, and the temporal proximity to the trial shows this testimony

---

[8] The majority attempts to distinguish <u>Fogle</u> and <u>Yarris</u> based on the fact that the allegations in <u>Fogle</u> were more detailed than those in <u>Yarris</u>. However, the majority does not identify the additional details in <u>Fogle</u> that made the prosecutors' actions more investigatory in nature than the prosecutors' actions in <u>Yarris</u>. A review of the two cases reveals that the crux of the allegations regarding the solicitation of false testimony was nearly identical. <u>Compare</u> <u>Fogle</u>, 957 F.3d at 164 ("Fogle alleges that the Prosecutors not only solicited false statements from jailhouse informants, but deliberately encouraged the State Troopers to do the same knowing their evidence was weak . . . ."), <u>with</u> <u>Yarris</u>, 465 F.3d at 139 ("[T]he ADAs used a 'stick and carrot' treatment to elicit[] [the] jailhouse informant['s]" false testimony" (quotations omitted)). Thus, the supposed difference in the amount of detail in the allegations in each case does not provide a basis for distinguishing them from each other.

was intended to be used for trial rather than for an investigative purpose. [9]  Second, in <u>Fogle</u>, there was a "long chain of investigative events led, or supervised, by [the prosecutors]" both before and after Fogle's arrest, 957 F.3d at 163, whereas the complaint here does not allege that the ADA played any role before Roberts was charged.  Thus, based on <u>Yarris</u>, the ADA's actions were taken in his capacity as an advocate for the State in preparation for trial.  As a result, the ADA is entitled to absolute immunity.

While the alleged conduct is serious and of course is not condoned, the law cloaks the ADA in absolute immunity.  I therefore respectfully dissent.

---

[9] Roberts asserts that <u>Yarris</u> is distinguishable from this case because "[i]n contrast to the passive conduct of the prosecutor in obtaining the false statements described in <u>Yarris</u>, [the ADA here] actively approached [the witness] and asked him if he 'wanted a piece' of the prosecution for the purpose of fabricating a motive."  Appellee's Br. at 16.  It is not accurate, however, to characterize the prosecutors' actions in <u>Yarris</u> as "passive."  Indeed, the <u>Yarris</u> complaint asserted that the prosecutors had "used a 'stick and carrot' treatment to elicit [the] false testimony."  465 F.3d at 139.  This is nearly identical to the allegations here, where the complaint alleges that the witness agreed to provide a statement "to gain favor related to hi[s] own pending criminal charges."  App. 52 (Compl. ¶ 87).